THE SANITARY DISTRICT OF CHICAGO, Appellant, *vs.*
EMMA B. CORNEAU *et al.* Appellees.

*Opinion filed December 17, 1912—Rehearing denied Feb. 5, 1913.*

1. EMINENT DOMAIN—*what is not proper cross-examination of expert.*  Where a witness in a proceeding to condemn a tract of land underlaid with stone has qualified as an expert concerning the stone trade, he may be asked, on cross-examination, any question which will test his learning and accuracy or which will show the reasonableness or unreasonableness of his opinion, but it is improper to allow a hypothetical question which puts before the jury supposed facts concerning the sales and leases of property not similar in locality or character to the land sought to be condemned and which the defendant would have no right to prove.

2. SAME—*a fact not pertinent to issue cannot be assumed in a hypothetical question.*  A fact which is not pertinent to the question being tried, and which the law will not permit to be proved as having any tendency to create or justify an opinion, cannot be assumed in a hypothetical question.  (*West Chicago Street Railway Co.* v. *Fishman,* 169 Ill. 196, distinguished.)

3. SAME—*when evidence of what defendants bid for property is not competent.*  If the owner of land condemned has purchased the property so recently that its cost will afford an indication of its present value either party may prove the price paid, and the same might be true if the sale were a public judicial sale which was not forced or compulsory; but it is not competent to allow the defendants to show that three and one-half years before the trial they bid in the property at $500 per acre at a partition sale, where they were already the owners in common of an 80/81 interest therein and their bid was the only one made.

4. SAME—*when petitioner is entitled to instruction that railroad right of way cannot be condemned for private purposes.*  In a proceeding by a sanitary district to condemn a tract of land to be used for a channel, where it is claimed by the defendants that the greatest value of the land is for a stone quarry, although it has no shipping facilities and does not adjoin any railroad, the nearest railroad line being over a mile distant, the petitioner is entitled to an instruction stating that the right of way for a railroad to the land could not be condemned for private purposes.

APPEAL from the Circuit Court of Cook county; the
Hon. RICHARD S. TUTHILL, Judge, presiding.

JOHN C. WILLIAMS, P. C. HALEY, and JAMES S. HANDY, for appellant.

COBURN & BENTLEY, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The Sanitary District of Chicago, appellant, filed its petition in the circuit court of Cook county to ascertain the compensation to be paid to Emma B. Corneau, David E. Corneau and Florence B. Paulson for 35.77 acres of land in the Sag valley, to be used for a channel connecting the Calumet river with the main channel of the sanitary district at the Sag. The Sag valley is approximately half a mile wide, and the Calumet feeder, or Sag feeder, extending from the Illinois and Michigan canal at the Sag to the Calumet, runs through the center of the valley. The right to use that feeder was donated by the State to the sanitary district, and the southern boundary of the tract in question is the center of the feeder. The tract is located in the valley, which is bounded on the north and south by ranges of hills. There was a trial, resulting in a verdict fixing the compensation at $500 an acre, and the court, after over-ruling a motion for a new trial, entered judgment on the verdict.

The land is wet a large part of the year and in places is boggy. It produces coarse grass,—a part of it slough grass,—and has only been used for hay. The witnesses called by the appellant estimated its value at prices ranging from $60 to $100 an acre, and the appellant also proved a number of recent sales of property in the immediate vicinity at prices from $48 to $100 an acre. The sales were either of land on the hills bordering the valley, or were of tracts the greater portion of which was on the hills, where the soil was not so rich or productive as that of the valley, but the lands had the advantage of being adapted for

diversified farming and raising crops, while the greater part
of the land in the valley could not be used for ordinary
farming purposes. These witnesses regarded the land of ap-
pellees as best adapted for a meadow as its most valuable
use, and that was the use to which it had been applied. The
land is underlaid with limestone, and the appellees exam-
ined several witnesses who placed values upon it as a stone
quarry ranging from $500 to $1000 an acre, and three wit-
nesses valued it at $150 to $300 per acre for the purpose
of removing the black earth and hauling or shipping it away
and selling it. The bed of stone is covered with earth va-
rying in depth at different places but averaging 8.2 feet.
The surface consists first of black earth from one to two
feet deep and of the average depth of 1.2 feet. Underneath
that there is a layer of soft yellow clay mixed with sand,
which gradually turns to a blue clay as it nears the stone.
The witnesses described two qualities of stone in that re-
gion,—the one called "tame stone," which could be cut
or dressed for building purposes, and the other as "wild
stone," which was of a flinty nature and a bluish color and
which could not be so used,—and there was some differ-
ence of opinion between witnesses as to the quality of the
stone on this land. The market for stone is in Chicago, and
the land is about sixteen miles from the court house by an
air line and twenty-three and one-half miles by the nearest
traveled roadway. Land is of no value as a quarry with-
out shipping facilities, and this land is one and seven-tenths
miles from the Chicago and Alton and the Chicago and
Joliet Electric railways west of it, and the nearest railroad
east of it is the Wabash, five and seven-tenths miles dis-
tant. The theory upon which values were based by the wit-
nesses for appellees was that a railroad could be built to
the nearest railroad connection and the surface be removed
from the stone and the rock quarried and shipped, and that
such a railroad could be built by obtaining consent of the
owners of the property over which it would run or organiz-

ing a railroad corporation and condemning a right of way. Eight witnesses who had had long experience in the quarry business, ranging from ten to fifty years, testifying for the appellant, were of the opinion that the existence of lime-stone under the land did not add anything to its value, and gave as their reasons the lack of shipping facilities, the expense of stripping the surface from the stone, which one witness computed to cost $3120 per acre, but mainly on the ground of the change in the quarry and stone business, which had rendered it unprofitable. They testified that the introduction of cement, and the manufacture of concrete from it, had practically destroyed the dimension-stone business; that rubble-stone was now only used to a limited extent for foundations or cellar walls of small buildings; that practically the only remaining use of stone of the character of this stone was for crushing purposes, to be applied to the uses of crushed stone and for concrete, and that it was not regarded as good for concrete as gravel, which was harder and less affected by heat. The evidence for appellant was that on account of such conditions many quarries, with their machinery and appliances, had been abandoned as unprofitable.

One of the witnesses testifying for the appellant was Adam Groth, who had been in the stone business for over fifty years and had a very large experience both in quarries and as a general contractor in erecting many important buildings in various parts of the country. He testified that in 1888 and 1889 there were thirty quarries in operation in Joliet and its surroundings of the kind of stone common to this region, well equipped with machinery; that not more than five were still in operation; that some stone was still used for foundations of small buildings and crushed stone was used for concrete; that cement had become so cheap that concrete had supplanted stone for most of the uses to which stone had been applied; that Bedford stone from Indiana was the stone generally in use for building pur-

poses, and that in his opinion the existence of stone on the land in question did not add to its value. On cross-examination he was asked if he would be astonished if he were told that the cheapest piece of land that had been sold in ten years between Summit and LaGrange, where quarries were located, sold for $2500 an acre. That property was ten miles or more from this land and differently situated with reference to shipping facilities. It was nearer Chicago, with railroads running by it and switching facilities and immediate connection with all railroads entering Chicago, and ten or eleven miles nearer the market. An objection was made to the question, and the court sustained the objection but ruled that counsel would have a right to re-frame the question as a hypothetical one. Under that ruling counsel were permitted to ask the witness whether, assuming that the cheapest piece of land sold at Summit and LaGrange was sold at $2500 an acre and the next lowest price that land was sold for was $3000 an acre, and that the great majority of the owners of land would not sell it but had leased it for just the privilege of quarrying stone at a valuation of $4250 an acre, it would have affected his opinion as to the land down in the Sag valley. Later upon the trial appellees attempted to prove the sales and leases assumed in the hypothetical questions, and the court correctly refused to admit the evidence. It is not now claimed that the appellees had any right to make such proof, on account of the great dissimilarity in the situation of the property and the facilities for its use as a quarry, but it is claimed that the questions were proper to test the knowledge of the witness and the value of his opinion. He had qualified as an expert concerning the stone trade, the uses of stone and the extent and nature of the market, and the law would permit any inquiry, on cross-examination, by which his learning or accuracy would have been tested or the reasonableness or unreasonableness of his opinion on those subjects would have been shown, but the effect of the

257 — 7

ruling was to permit the appellees to put before the jury sales and leases of tracts not similar in locality or character to the land in question and which could not have been otherwise proved. That was a violation of the rules for examination of witnesses of the same character as that condemned in *Chicago and State Line Railway Co.* v. *Kline,* 220 Ill. 334, where it was said that counsel accomplished practically the same result as though incompetent proof had been admitted, by questions concerning sales asked on cross-examination.

In the case of *Chicago and State Line Railway Co.* v. *Mines,* 221 Ill. 448, counsel, in cross-examining a witness as to value, asked if he did not know of the sales of particular tracts at named prices, when the lands were, in fact, not similar in locality and character. The court ruled correctly, but it was held that the action of counsel conveyed to the jury information which they should not have, and was improper. The court cited *Scripps* v. *Reilly,* 38 Mich. 16, where it was said that everything having a tendency to influence a jury in their deliberations which is not lawfully admissible in evidence on the trial of the cause, should be, so far as possible, kept from coming to their knowledge during the trial; that all courts agreed in excluding incompetent testimony, and an error in this respect will be sufficient cause for a reversal, and that the essence of the wrong exists in the fact that such incompetent testimony is brought to the attention of the jury more than in the method adopted in communicating the fact.

Counsel for appellees think that the decision in *West Chicago Street Railway Co.* v. *Fishman,* 169 Ill. 196, justifies the ruling, but they overlook the necessary qualification stated in that case, that the fact to be assumed in the hypothetical question, upon the cross-examination of the expert, must be pertinent to the inquiry. The facts assumed in these hypothetical questions had no tendency to elicit the reason upon which the witness based his opinion, because;

under unquestioned rules of law, they had no tendency to
fix or establish the value of the land for which compensa-
tion was being ascertained.   A fact which is not pertinent
to the question being tried and which the law will not
permit to be proved as having any tendency to create or
justify an opinion could not be assumed in a hypothetical
question, and the facts assumed in these questions were of
that character.

The appellees Emma B. Corneau and Florence B. Paul-
son were the owners, as tenants in common, of 80/81 of
the land sought to be condemned and adjoining land, to-
gether constituting a tract of about fifty-four acres.   Under
a decree in a partition suit the land was sold about three
and one-half years before the trial and they bid it off at
$500 per acre, retaining their share of the purchase price
and paying the 1/81 portion of the same for the other in-
terests.   The first and only bid for the property was $500
an acre, so that there was no competition, and there seems
to have been some kind of an understanding that the ap-
pellees would bid that amount.   The court permitted appel-
lees to prove that sale as tending to show the fair market
value of the property, upon the theory that although it
would not have been competent for the appellant to prove
what the property sold for, it was competent for a property
owner to make the proof.   The court was of the opinion
that the appellees stood in a different attitude from the ap-
pellant and could offer evidence of that character if favor-
able to themselves, and counsel for appellees contend for
the same doctrine, and that evidence of that character is
competent or incompetent, depending upon which party of-
fers it.   If an owner has purchased property from another
within a time so recent that its cost will afford any indica-
tion of its present value it is competent for either party to
show the price paid, and perhaps that might be so of a pub-
lic judicial sale which is not forced or compulsory; but
here the appellees were bidding for their own property, ex-

cept as to a very small share, and they received practically all of the purchase price. It made no difference to them what they bid except as to 1/81 part, and the sale did not come within any rule that has been adopted with reference to proving sales. The court erred in admitting the evidence, and also in refusing an instruction directing the jury to exclude from their consideration the testimony in relation to the sale.

The court refused to instruct the jury that the right of way for a railroad to the land could not be condemned for private purposes. That is the law and the instruction was applicable to the case, but counsel for appellees say that the rule of law was not controverted at the trial; that the case was not tried on the theory that one of the railroad companies would put in a switch across the lands of others to this land or that appellees could condemn a right of way, but that it was conceded that a railroad would have to be built by the consent of property owners or a railroad company be organized for the purpose. A railroad corporation could not be organized to build a railroad which would not be a public one, serving the entire public, but only for private purposes of a quarry, and the appellant had a right to have the jury instructed on that question, leaving them to determine the probabilities of securing shipping facilities for a proposed quarry on the land under existing laws, which was a matter that would be taken account of by anyone proposing to establish a quarry there.

Appellant complains of other rulings of the court, but they relate to matters and situations which will not occur on another trial.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*