(No. 19090.—)

THE FOREST PRESERVE DISTRICT OF COOK COUNTY, Appellee, *vs.* JOHN M. DEARLOVE *et al.* Appellants.

*Opinion filed December 20, 1929—Rehearing denied Feb. 5, 1930.*

GEORGE A. MASON, (HENRY E. MASON, and GEORGE I. HICKS, of counsel,) for appellants.

JOSEPH P. SAVAGE, and ADOLPH D. WEINER, (FRANK S. RIGHEIMER, and RALPH W. CONDEE, of counsel,) for appellee.

Mr. COMMISSIONER EDMUNDS reported this opinion:

The Forest Preserve District of Cook county filed its petition to acquire by eminent domain proceedings a tract of 32.06 acres of land. The jury found compensation due for this tract in the sum of $25,648. The jury also found that there were no damages to the remainder of the larger tract of which it was a part. From a judgment based on the verdict the parties who asserted interests under a cross-petition have appealed.

The property sought to be acquired lies some two miles from DesPlaines, about a mile west of Milwaukee avenue and 550 feet north of Central road. The nearest rail transportation is that which serves DesPlaines and Glenview, the latter being a town some three miles to the east. The tract is a level, inside piece, not fronting on any public highway, the only egress being by private way to Central road. About one quarter of it is cleared, the balance being covered with a heavy growth of timber, including oak, maple, hickory and walnut. It extends 2640 feet east and

west and about 529 feet north and south. Holdings of the Forest Preserve District adjoin it on both north and south.

The petition, which was filed by appellee on October 3, 1927, named as defendants John M. Dearlove, who was title holder of record, together with Glen C. Tobin, Fritz Koelling and unknown owners. Service was duly had. Dearlove entered his appearance through attorneys but filed no pleading of any kind. During the trial he died, and upon suggestion of his death his son, Harley H. Dearlove, was given leave to file appearance. The case was set for trial on January 16, 1928. On January 23 following, Leo C. Schnake and the Forest View Country Club filed appearance and prayed that compensation be awarded for interests claimed by them in the property. On May 4 following, by agreement, leave was given Schnake and the club to file their cross-petition instanter.

In the cross-petition it is alleged that on May 14, 1927, John M. Dearlove and Leo C. Schnake entered into a contract whereby Schnake agreed to purchase from Dearlove a tract of approximately 127 acres, which included, and the contract for which had certain special provisions with reference to, the 32 acres involved in the present proceeding, the purchase price to be $132,219. A copy of this contract is attached to the cross-petition as an exhibit. After describing the tract as a whole by metes and bounds and setting forth certain conditions as to taxes, etc., the contract provides as follows: "Said purchaser has paid $10,000 as earnest money, to be applied on such purchase when consummated, and agrees to pay within five days after the title has been examined and found good or accepted by him, * * * the further sum of $32,219, * * * provided a good and sufficient general warranty deed, conveying to said purchaser a good and merchantable title to the wooded land comprised in said described premises, being approximately 32 acres, (subject as aforesaid,) shall then be ready

for delivery; the further sum of $10,000 on or before October 1, 1927, provided that at said date of October 1, 1927, or before, a good and sufficient general warranty deed conveying to said purchaser a good and merchantable title to the balance of said above described premises, subject as aforesaid, (except as may hereinafter be provided,) shall then be ready for delivery. * * * It is further understood and agreed that $9000 of said earnest money is represented by a note of said purchaser of even date herewith payable sixty days after date thereof, and that in no case shall the vendor be required· to deliver said deed until said last mentioned note and interest thereon has been fully paid. * * * It is further understood and agreed that the vendor shall pay Charles A. Fowler a commission of five per cent on the selling price herein mentioned, for his services in procuring this contract. It is further understood and agreed that if said purchaser takes title to the wooded land hereinbefore described as comprising approximately 32 acres, the consideration therefor shall be at the rate of $1600 per acre, which, when paid for, shall be credited upon the total purchase price of $132,219." The cross-petition further alleges that on July 20, 1927, Schnake entered into a contract with the Forest View Country Club whereby the club agreed to buy at a price of $206,871.50 the property covered by the contract just described; that $10,000 was paid down as earnest money, $1000 in cash and the balance by assumption of the above $9000 sixty-day note; that $2000 had been paid on said note; that a further sum of $46,871.50 was to be paid on the contract after the title had been examined and found good, the balance to be taken care of by deferred payments. The cross-petition further alleges that the highest and best use for the entire tract of 127 acres covered by the above contracts is for country club and golf purposes, and that the 95-acre balance of the tract would be greatly damaged by taking off the 32 acres sought by the Forest Preserve Dis-

trict. Damages are prayed for the part not taken, as the interest of cross-petitioners may appear. The pleading is verified by Charles A. Fowler as vice-president of the Forest View Country Club. Schnake took no part in the trial. Contracts answering the description set forth in the cross-petition were produced in evidence at the trial by appellants. They had been recorded on January 24, 1928.

The position of appellants throughout the trial followed the theory of their cross-petition—that the 95-acre tract standing alone would be less valuable than as part of the whole, and that damages were accordingly forthcoming not only for the 32 acres actually taken but for the alleged decrease in value of the 95 acres retained.

After the jury had viewed the premises appellee called as a witness Austin L. Wyman, who testified that as an attorney at law he had in January, 1927, filed in the circuit court of Cook county a bill to construe a will and for leave of court to sell a 68-acre tract known as the McDonald farm, across Central road from the 127-acre Dearlove tract; that title to the farm was held by a trustee under the will; that it was clear; that he (Wyman) conducted negotiations for the sale from March to the latter part of June, 1927; that he sent letters to about fifty brokers operating in that vicinity; that he finally sold it for $700 per acre net; that the farm had previously been sold for taxes and was not producing any income; that the trustee had no money as trustee; that Mrs. McDonald, a beneficiary, had money at his office with which she was going to redeem the taxes, but he advised her there was no reason for her to pay money out of her own pocket and told her not to; that he wanted to get the best price possible for the farm for the estate; that he thought it should have been worth $850 per acre, but no one would pay it.

Appellee also introduced the testimony of G. W. Kunstman, Hyde W. Perce and Jacob Geiserowich. Kunstman testified that he had been engaged in the real estate busi-

ness in Chicago for twenty-eight years; that he had bought and sold acreage, vacant and improved property, and made appraisals for corporations, banks, trust companies and law firms in Chicago and Cook county; that he was familiar with the 32-acre tract and the adjoining territory; that the highest and best use of the cleared portion of the tract was for truck farming, and of the wooded portion to hold as an investment until the time was ripe for subdividing; that the tract was worth $650 per acre; that he based this valuation upon his knowledge of three or four sales in the immediate vicinity, including that of the McDonald farm, as well as others in other parts of the county. Geiserowich testified that he had been engaged in the real estate business for twenty-one years and had bought and sold property in and around Chicago; that he was familiar with the 32-acre tract; that he had known the entire district for possibly fifteen years; that the highest and best use of the cleared portion of the 32-acre tract was for truck farming and of the wooded portion for summer homes; that the tract was worth $675 per acre; that it had no larger value as part of the 127 acres than standing alone; that he had appraised a number of parcels in the vicinity within the past five years; that in fixing the value stated he took into consideration a number of sales which he knew of in the vicinity, including that of the McDonald farm. Perce testified that he had been in the real estate business since 1890; that he had bought and sold real estate in all its branches and had subdivided and appraised property in Chicago and Cook and Lake counties; that he was familiar with the 32-acre tract; that the highest and best use of it was to hold for summer home subdivision purposes as the development around Chicago approached; that it was worth $700 per acre; that he based his opinion on knowledge of the development in and around Des-Plaines and the North Shore, and that he also considered the sale of the McDonald farm.

Appellants contend that all the evidence as to sale of the McDonald farm should have been stricken out. It is well settled that evidence of voluntary sales of land in the vicinity and similarly situated is admissible to aid in estimating the value of the land to be taken by eminent domain. Whether or not any given sale shall be admitted under this rule lies within the discretion of the trial judge. (*Forest Preserve District* v. *Caraher,* 299 Ill. 11.) Appellants argue that the McDonald sale was not a voluntary one within this rule, and cite *Lanquist* v. *City of Chicago,* 200 Ill. 69, where the court held that the respondent in a condemnation proceeding could not introduce evidence of what he paid for the property, he having taken it from an insolvent debtor in part payment of a previous indebtedness. In *Peoria Gas Light Co.* v. *Peoria Terminal Railway Co.* 146 Ill. 372, also cited by appellants in this connection, it was held that in a condemnation proceeding petitioner could not introduce evidence of the price paid by it to other property owners for property which it proposed to use. In the latter case the court said: "The theory upon which evidence of sales of other similar property in the neighborhood at about the same time is held to be admissible is, that it tends to show the fair market value of the property sought to be condemned, and it cannot be doubted that such sales, when made in a free and open market, where a fair opportunity for competition has existed, become material and often very important factors in determining the value of the particular property in question. But it seems very clear that to have that tendency they must have been made under circumstances where they are not compulsory, and where the vendor is not compelled to sell at all events but is at liberty to invite competition among those desiring to become purchasers." The McDonald farm was offered upon the open market. Over fifty real estate brokers were invited to become purchasers. The property was unincumbered, those interested in it had the where-

withal to redeem it at any moment from the tax sale, and money to meet the taxes for years to come could have been obtained without difficulty by a loan thereon. There was neither the potential legal compulsion to sell which was present in the *Peoria Gas Light Co. case, supra,* nor the business necessity that compelled the purchaser in the *Lanquist case, supra,* to take the property or lose his money. On the other hand, free and open competition was here invited and received over a period of several months. This court said in *Sanitary District* v. *Corneau,* 257 Ill. 93: "If an owner has purchased property from another within a time so recent that its cost will afford any indication of its present value it is competent for either party to show the price paid; and perhaps that might be so of a public judicial sale, which is not forced or compulsory." The mere fact that the sale of the McDonald property was under a decree of court does not make it forced or compulsory. The trial court did not err in overruling the motion to strike the testimony as to this sale from the record.

Appellants assert that the trial court should have sustained their motion to strike out the entire testimony of Kunstman and Perce because these witnesses took into consideration, in giving their opinions, the "probable future use of the land and not its present adaptability to a particular use to which the property would undoubtedly be devoted in the future." Both of these witnesses did state that the best use of the tract, or the larger portion of it, was to hold for future subdivision purposes. It is a matter of common knowledge that as great metropolitan areas expand, land previously used for farming and pasturage is broken up into subdivisions. Such is the normal possibility for all property lying immediately adjacent to such areas. Even before subdivision in due course becomes an actuality there is a transition period in which such land may by reason of its apparent approach command a greater present value than for agricultural or other purposes.

Whether this value may be termed speculative, or whatever may be its precise economic nature, it is for the time being existent. This court said in *Chicago and Evanston Railroad Co. v. Blake*, 116 Ill. 163: "The uses and capabilities of a particular property, the prices at which like property in the neighborhood is held or offered, knowledge or observation of the growth and development of towns and cities, a general knowledge of trade and business, and of the commercial advantages or prospects of the place where the property is situated, are all matters more or less taken into account by the intelligent witness in forming his opinion as to the value of a particular piece of property." The witnesses in question appear to have qualified their opinions well within the scope of this pronouncement, and the motion to strike their testimony was properly overruled.

Appellants contend that the verdict is contrary to the evidence. In passing upon this assignment of error it is necessary to bring into consideration the evidence offered by appellants and the rebuttal testimony presented by appellee.

Walter H. Tallant testified for appellants that he had bought and sold real estate in the locality for five years; that he was one of the purchasers of the McDonald farm, which had been bought by a syndicate as a speculation; that they were still holding it; that it had 1600 feet frontage on Central road; that he had sold a 12-acre tract near Potter road, with 500 feet of frontage on Dempster street, for $2000 per acre; that he had sold a 5-acre tract, with frontage of 400 feet on Ballard road, (a paved concrete highway,) for $2000 per acre; that the highest and best use of the 127 acres of which the 32 acres were a part was for golf and country club purposes; that the value of the 32 acres as part of the 127 acres was $3000 per acre; that the value of the 95 acres with the 32 acres attached was $2000 per acre; that the value of the 95 acres without the 32 acres would be $1500 per acre. On cross-examina-

tion Tallant said the 32 acres were worth $3000 per acre standing alone.

H. L. Rietz testified that he was city clerk of Des-Plaines and had been in the real estate business for seven years; that he was familiar with the land; that the value of the 32 acres as part of the whole was $3000 per acre; that the highest and best use of the 127 acres was for country club and golf purposes; that the value of the 95 acres as part of the whole was $1650 per acre; that their value alone would be only $1000 per acre. Under cross-examination he stated that "highway frontage is worth twice what it is inside."

Carl Elsner testified for appellants that he paid $22,000 for 18½ acres with 160 feet of frontage on Central road. At the time he bought it the tract was improved as a truck farm, and on it was a house, barn, garage and other buildings.

Emma Beyer testified that she paid $12,500 for 9.6 acres at the corner of East River road and Central road, with 1178 feet of frontage on Central road and 387 feet of frontage on East River road. At the time she bought it there were on it an uncompleted bungalow, a garage and a chicken house.

Steve Kavolik testified that he paid $17,000 for eight acres with a frontage of 850 feet on Milwaukee avenue, 1000 feet north of Central road. He testified that he was operating a gas station on the property, which was vacant at the time he bought it.

Walter C. Oehler, an undertaker, Henry F. Heller, a doctor, Fred A. Fulle, a printer and publisher, William J. Hausam, a bank cashier, and Charles A. Fowler, the real estate man who had negotiated the Dearlove-Schnake contract, testified that the highest and best use of the 127 acres was for country club and golf purposes. All were members of the syndicate which constituted the Forest View Country Club.

A. S. Calkins, of Barrington, Illinois, testifying for appellants, submitted plans which he had drafted for a golf course on the 127 acres and stated that he was in the business of landscaping and golf course construction; that the highest and best use of the 127 acres was for country club and golf purposes; that there were thirty-five or forty golf clubs within ten miles of the tract; that it would be necessary to remove eighty per cent of the trees on the 32 acres to construct the four holes projected thereon; that he estimated the total cost of construction at $75,000; that he had signed a contract to build the course on a cost-plus basis, with a limit of $75,000; that he had not received the $2500 payable to him by the terms of the contract when it was signed on September 23, 1927. Charles B. Rowe testified that he had been in business as an architect for six years; that he was familiar with the 127 acres; that Fowler had employed him to design the club house, and on August 1, 1927, he contracted with Fowler to furnish architectural services at the rate of six per cent of the cost; that the cost of the club house shown on the sketch and pictures prepared by him and introduced in evidence was estimated at $250,000; that it would contain one thousand lockers. Hausam testified that Calkins and Rowe had not been paid for their services.

Jock Hutchinson, testifying for appellants, stated that he had had many years' experience as a golf professional at St. Andrews, in Scotland, and in the United States; that he had been twelve years with the Glenview club; that Fowler had hired him about a month before and he had gone over the ground carefully; that the layout of the course projected for the 127 acres was all right; that a number of trees on the 32 acres would have to be removed; that the 95 acres would not be enough for a course; that a championship course could not be laid out on 95 acres.

By way of rebuttal appellee called Leonard Macomber, who testified that he had been a golf architect for nineteen

years; that he had established a special technical bureau of the Chicago District Golf Association for the giving out of information on golf architecture and golf course construction; that he had visited a thousand or fifteen hundred golf courses in the United States and in Great Britain, Belgium, France and all the South American countries; that he had laid out or acted in an advisory capacity for several hundred golf courses, naming fifteen that he had recently had to do with; that he knew of a great many golf courses on 95 acres or less, naming St. Andrews, Prestwick and North Berwick, in Scotland, St. George's Hill, in England, containing the championship qualification grounds, (85 acres,) and Evergreen and Mid-City, in Chicago; that the Edgewater club on the North Side had 87 acres and the Harlem Golf Club occupied 95 or 97 acres; that the Evergreen, Mid-City and Harlem courses were the best paying fee-courses in the Chicago district, it being an advantage to keep the acreage as small as possible in order to keep down the capital investment; that he had visited the 127 acres involved in the present proceeding; that a good golf course could be laid out on the 95-acre portion; that from a commercial standpoint this was the only feasible thing, because no profit could be paid on an investment of $75,000 for a course, $250,000 for a club house and $200,000 for land, with an annual operating expense certainly exceeding $25,000 (giving a detailed estimate of receipts if a fee course); that as a private club $1500 would be the cost of a membership, and there were plenty of such memberships for sale elsewhere; that there was no demand or excuse for a course on the land in question; that the land is flat and badly drained; that in order to utilize the 32 acres, seventy-five or eighty per cent of the trees would have to be cut, and that portion being between a wooded area of the forest preserve would be excessively hot; that the east and west holes which would be on it would be objectionable from the standpoint of the early morning and the setting sun; that he was not on the pay-

roll of the Forest Preserve District and did not need or expect any work from it; that the 127 acres would not make a good course because of its shape, it running a mile in length east and west; that in any event the 32 acres would be a waste of money.

Charles Evans, Jr., another witness for appellee, testified that he was an investment banker, golf writer and golf secretary for the forest preserve and had played golf for twenty-five years; that he had held every amateur golf title except the British; that he had played at St. Andrews, which has an actual acreage of less than 95 acres; that the four holes projected on the 32-acre tract were very poor golf architecture; that an eighteen-hole course could be constructed on the 95 acres remaining but would not be profitable because of lack of transportation facilities and the fact that the northwest and north were getting over-built as to golf clubs; that at Olympia Fields, with seventy-two holes and a membership of 1200, only eight or nine hundred lockers were needed; that the average eighteen-hole club around Chicago had 300 members; that if a golf course were constructed on the 95 acres, witness would put on a $25,000 club house if a private club, and $10,000 or $12,000 if a fee course; that any club that has put up a club house costing $200,000 or $300,000 has been sorry.

Appellee made out its case by putting in evidence as to the value of the 32-acre tract described in the petition. So far as the remainder of the 127 acres was concerned, the burden of proof was on appellants to show what, if any, damage there was to it. (*Illinois Power and Light Corp.* v. *Talbott,* 321 Ill. 538.) Appellants lay great stress upon the fact that their witnesses Tallant and Rietz testified to $47,500 and $57,000 damage to the remainder, respectively, and that appellee presented no evidence to contradict these particular figures. Before there was any occasion to go into consideration of the number of dollars and cents, the question whether there was any damage at all to the remainder had to be settled, and appellee met this issue

squarely. The witnesses for appellants who testified that the highest and best use of the 127 acres was for country club and golf purposes and that the 95-acre tract remaining would not suffice for a golf course were in numerical preponderance, but the contrary testimony offered by appellee's witnesses was forceful, to the point and apparently authoritative. We are not warranted in disturbing the jury's finding that the remainder was not damaged. *Fahnestock* v. *City of Peoria,* 171 Ill. 454.

As to the value of the 32-acre tract itself, it will be observed that the jury placed on it a value of $800 per acre, which exceeded the lowest estimate of appellee's witnesses by $150 per acre and the highest estimate of appellee's witnesses by $100 per acre. It exceeded the sale price of the McDonald farm by $100 per acre. But appellants call attention to the discrepancy between this $800 allowance and the amounts paid for the Elsner, Beyer and Kavolik tracts, which sold at the rate of $1189, $1302 and $2125 per acre, respectively. The first two were much smaller tracts, were on highways and were improved, as above shown. The Kavolik tract was still smaller and was adapted to usage as a public filling station. Appellants also call attention to the Dempster street and the Ballard road tracts, which sold at the rate of $2000 per acre. That there was a rather marked dissimilarity between these and the 32-acre tract is affirmatively evident, and such dissimilarity is favorable to a considerably higher value in the case of these other tracts. So far as actual sales in the vicinity are concerned, it cannot be said that the value fixed by the jury appears to be any more out of line with the evidence produced by appellants than with that introduced by appellee. Appellants point to the $3000-per-acre valuations placed upon the property by their experts Tallant and Rietz. Tallant testified on direct examination that the 32-acre tract was worth $3000 per acre as part of the whole tract. On cross-examination he testified that it was worth the same

amount per acre standing alone. He testified that whereas the 95 acres were worth $2000 per acre as part of the whole, alone they were worth $500 per acre less. The basis for Rietz's value is shown by the following questions and answers:

Q. "Mr. Rietz, what, in your opinion, was the fair cash market value of this 32-acre tract when this suit was filed, as part of the whole tract?

A. "$3000 an acre.

Q. "Upon what do you base that evidence of value?

A. "Upon the demand for land of that description in the neighborhood.

Q. "Anything else?

A. "Part of the tract as a whole—desirability. The nature of the 32 acres made it a very attractive piece of land in conjunction with the remainder."

Rietz testified that the 95 acres apart from the 32 acres would be diminished in value "close to half," but did not give any opinion on the value of the 32 acres apart from the 95 acres. When all the evidence before the jury is analyzed, reasons why the $3000 figure as given by these witnesses might be considerably discounted are obvious.

The verdict is therefore not against the evidence. It is, on the other hand, well within the range of the evidence. It is the settled doctrine of this court that the damages awarded by a jury in a condemnation proceeding will not be disturbed where the evidence is conflicting, the jury views the premises and the amount of compensation fixed is within the range of the evidence, unless there appears to have been a clear and palpable mistake or the verdict was the result of passion and prejudice. *Jefferson Park District* v. *Sowinski*, 336 Ill. 390; *Southern Illinois and Kentucky Railroad Co.* v. *Johnson*, 321 id. 187.

Appellants seek to come within the exception to the rule thus announced by urging that the verdict is the result of passion and prejudice, caused by the intemperate

and violent language of counsel for petitioner in their closing arguments. In following up this contention they attack many statements to which no objection appears by the abstract to have been made. The propriety of these statements is not before us for review. Parties cannot complain of alleged improper remarks to the jury where they do not make an objection and obtain a ruling by the court. (*Brant* v. *Chicago and Alton Railroad Co.* 294 Ill. 606; *Peterson* v. *Pusey,* 237 id. 204; *Chicago City Railway Co.* v. *Handy,* 208 id. 81.) At two junctures they did object. In one of these instances counsel had stated: "Who was the boy who prepared this suit? Fowler. Fowler. And yet he took the stand in the Koelling case and swore that there wasn't any contract. He is the fellow that is coming in here now and asks you to give $50,000 damages." Objection to this statement was overruled. This line of argument had reference to questions asked Fowler on cross-examination in the present case relative to testimony given by him in another proceeding in which the Forest Preserve District was seeking to condemn the Koelling property, adjacent to that involved here. In that case, which was tried after the execution of the Dearlove-Schnake contract, in which Fowler was the broker, as well as after the Schnake-Forest View Country Club contract, Fowler was a witness for Koelling. Counsel for the appellee had sought to impeach Fowler in the present case by producing the transcript of the Koelling trial and establishing on cross-examination that he had there testified that the property involved in the present proceeding was listed with him but he had not found a buyer for it, although he had tried, and did not know that it had been sold; that he later testified that he did know there was a contract but that it had been forfeited. Fowler admitted having made some of the answers read from the transcript but as to others insisted that he did not remember. In addition to claiming error because of reference to this in the closing

argument, appellants have assigned error because the trial court did not allow their motion to strike all this testimony from the record, their ground being that the impeachment was not completed by the introduction in evidence of the Koelling transcript. While it does not clearly appear from the abstract, the record shows that it was admitted by Fowler and his counsel in open court that he gave the answers read by counsel for appellee. The objection as to testimony tending to impeach Rietz in certain particulars is similarly met. The trial court did not err in overruling the motion to strike this impeaching testimony, and objections to references made thereto in the argument were properly overruled.

The other objection made to the argument of counsel went to an assertion that Fowler had admitted that the Dearlove-Schnake contract was forfeited. Counsel for appellants objected that the question of forfeiture was not one for the jury but for the court, whereupon the court stated to the jury as follows: "The court desires to inform you that the court will give you an instruction that there is no issue here as to the forfeiture of this contract or either of these contracts." Subsequently the court did give a proper written instruction to this effect. If there was any impropriety in this phase of the argument it was cured by the action of the court. _Brant_ v. _Chicago and Alton Railroad Co. supra._

Appellants object that the jury was not properly instructed on how to measure damages to the 95-acre remainder. The instructions refused were offered by the appellee. Their refusal is not, therefore, a matter of which appellants can complain. Moreover, the court gave instructions on the question of damages to the remainder which were at least as favorable to appellants as they had a right to have given.

Appellants contend that error was committed by the trial court in allowing the question of the separate inter-

ests of the cross-petitioners to get before the jury, because this was for the court, alone. Appellants introduced in evidence the Dearlove-Schnake and Schnake-Forest View Country Club contracts. The dates and recitals in the contracts spoke for themselves. Appellants also introduced the syndicate agreement and the contracts for building the club house and golf course. Fowler and other witnesses for appellants testified on direct examination that they were interested in the syndicate and the land. Having themselves introduced the matter of interest appellants cannot complain. *People* v. *Hoffman,* 329 Ill. 278.

The judgment of the circuit court of Cook county is affirmed.

.Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is rendered in accordance therewith.

*Judgment affirmed.*