Department of Public Works and Buildings of the State of Illinois for and in Behalf of People of the State of Illinois, Plaintiff-Appellee, v. James Dalessio, et al., Defendants, Jolerich Construction Co., Inc., an Illinois Corporation, Defendant-Appellant.

Gen. No. 66–82.

Third District.

November 25, 1968.

Adamowski, Newey & Riley, of Chicago, for appellant.

William G. Clark, Attorney General of State of Illinois, of Springfield, and Francis A. Dunn, Assistant Attorney General, of Joliet, for appellee.

ALLOY, P. J.

This is an appeal from a judgment of the Circuit Court of Will County in an eminent domain action in which the jury returned a verdict fixing just compensation of $12,462 for the land taken and $4,154 for damages to the remainder.

The record discloses that appellant, Jolerich Construction Co., Inc., an Illinois corporation, purchased 6.65 acres of vacant land from a school district at a public auction on November 20, 1960. It made no improvements on the land. On April 8, 1963, about 28 months after the purchase, the State of Illinois filed a petition for condemnation of 3.106 acres of this land. The 3.106 acres taken were out of the middle of the 6.65-acre tract, leaving an east and west tract which were both damaged by the taking. The amount of damage for the taking of the land and for the remainder not taken was contested as between the parties. The condemnation action was the result of the planning for construction of Interstate 80 although none of the particular tract was to be used for such route. The land taken was to be used for the east ingress and the west ingress of a diamond interchange for westbound traffic on Route I 80 and also for the relocation of a street

189

known as Richards Street. After completion of construction, two streets running past the property (Richards and Poplar) would be dead-end streets. The jury not only heard the evidence but also viewed the premises. They thereafter awarded $12,462 for the property actually taken and $4,154 for damages to the balance of the property not taken.

There was a wide variation in testimony of appraisers and witnesses as to value on behalf of the Department of Public Works and of the defendant-owner of the land. The appraisers for the State fixed damages for the taking and damages to the other two remaining tracts at totals of $14,000, $15,800, and $14,500 respectively, while witnesses for the property owner testified that damage ranged from totals of $85,000 to $125,503.35.

Early in the course of the trial, the property owner objected to any evidence being offered as to the fact that the 6.65-acre tract had been purchased at a public auction approximately 28 months before the filing of the petition for condemnation. The trial judge examined several witnesses outside the presence of the jury including the president of the defendant-company who attended the auction sale. Following such examination, the trial judge concluded that the evidence of the auction sale and the price paid for the 6.65 acres was admissible. With respect to the auction, the evidence disclosed that it was a sale of surplus property by a local school board. The sale was properly advertised and before the sale, the Joliet-Will County Board of Appraisers appraised the property for $4,500. The sale was held on November 20, 1960. Although it was shown there was a big snow that evening, testimony indicated that 20 bidders were present at the auction. The testimony disclosed that everyone was bidding until the bids reached $12,000, but after $12,000 was reached, there was only the representative of defendant and one other person who continued bidding. When the representative of defendant bid $18,000, the partner

of the remaining bidder told him to stop bidding, and Mr. Krypel, President of the defendant-company, purchased the 6.65 acres for $18,000. There was also testimony in the record that "public sales almost always bring the market value or better in Will County" and nothing in the record indicates that the auction sale was not fairly conducted and open to all prospective bidders. Evidence in the cause further disclosed that there were no changes in the property or the area between the time of the auction and the time of the filing of the petition for condemnation which would operate to change the value of the land. The 6.65 acres were rezoned from residential to business, but a showing was made that such rezoning could have been obtained at any time without difficulty and that this factor in itself did not affect the value during the intervening 28 months.

In the trial of this cause the property owner attempted to introduce evidence of the sales of land in the general area which occurred after the time of the filing of the petition for condemnation. One sale which the property owner attempted to show in evidence occurred 14 weeks after the filing of the petition and another 5 months after the filing of the petition. The trial court refused to allow evidence of any sale occurring after the filing of the petition. The property owner objected to the exclusion of such evidence.

The record also shows that there was very little development in the general area over the past 25 years. A Kroger store which was later vacated was located in the area and a pick-up laundry cleaning establishment and a Salvation Army building were the only new businesses which apparently had started in the area over the past 20 to 25 years. A witness for the property owner testified that he knew of only two homes built in the area in the last 25 years and also that the only other new businesses he recalled in addition to the ones already referred to were a funeral home and two gas stations. As far as

191

the record is concerned the net effect of testimony as to the growth of the area showed that the area was in fact static.

There was also conflict in the testimony of the appraisers for the respective parties as to the necessity of a fill in preparing the site for construction. Witnesses for the Department of Public Works testified that in arriving at their appraisals, they considered that due to the topography of the land, it would probably be necessary to bring in substantial yardage of fill in order to make the lot usable. Evidence on behalf of the property owner was to the effect that development of the land could be made without any dirt fill if proper business buildings were constructed with a basement.

An additional area of conflict in the evidence was as to the possible flooding of the land under consideration. All the witnesses agreed that the last time the entire area had been under water was in 1957. There was some evidence on behalf of the property owner, by an engineer on a sewer project through the area, that the outlet had been changed and that the entire condition of the area was changed and improved since 1957. There was, however, a photograph introduced into evidence showing the effects of a hard rain on May 12, 1966, which disclosed water in the creek within two or three inches of spilling over the top of the concrete wall and thus flooding the entire area. The possible flooding problem was considered by the Department's appraisers in arriving at their figures while the appraisers for the property owner testified that they felt that the flooding problem had been cleared up.

In the closing argument, the attorney for the property owner stated "again I remind you there is no business use to which this land can be put," which he emphasized for the benefit of the attorney for the State calling his attention to this argument by naming him. In argument in reply, the attorney for the State stated "I'll tell you

what business use this tract of land can be put to. It can be used for a parking lot for John Krypel, who owns the dance hall across the street." Objection was immediately made by defendant and the court sustained the objection, and ordered the statement stricken from the record and, likewise, directed the jury to disregard it, as requested by defendant.

The first issue for consideration is whether the trial court correctly admitted evidence of the purchase of the tract under consideration at a public auction 28 months prior to the filing of the petition for condemnation. As we have indicated in the statement of facts the evidence disclosed that the auction was well advertised, open to all bidders and attended by 20 people even though the weather was not favorable on the evening of the auction. There was also specific testimony that in the Joliet area, auction sales are a good indication of market value of the land. In an early Illinois case, Sanitary Dist. of Chicago v. Corneau, 257 Ill 93, 100 NE 517, the Supreme Court held that it was error to admit evidence of the price which owners paid at an auction sale where the owners involved were the owners of 80/81 of the land being sold and thus their bid had little significance. The court in that case found that the first and only bid for the property was $500 an acre so that there was no competition, and there seems to have been some understanding that the parties would bid that amount. Under such circumstances, the court declared that it was error to admit evidence of the purchase of the land. The court, however, stated (at page 99):

> "If an owner has purchased property from another within a time so recent that its cost will afford any indication of its present value it is competent for either party to show the price paid, and perhaps that might be so of a public judicial sale which is not forced or compulsory";

In the later Illinois case of Forest Preserve Dist. of Cook County v. Dearlove, 337 Ill 555, 169 NE 753, evidence of a sale of a tract (by trustees in a will under court authority), which tract was across the road from the property being condemned was held admissible. In that case it was shown that the title to the adjacent tract had been held by a trustee under a will and that the attorney negotiating the sale had contacted over 50 brokers for nearly four months before finally making the sale. The court indicated there that evidence of voluntary sales of land in the vicinity and similarly situated would be admissible to aid in estimating the value of land to be taken by eminent domain. The court indicated that whether or not any given sale should be admitted under this rule lies within the discretion of the trial judge. The court noted that the mere fact that the sale of the farm was under a decree of court did not make it a forced or compulsory sale. While there is no Illinois case which has been called to our attention or which we have been able to discover, where evidence of the purchase of exactly the same property at auction sale was under consideration, we see no reason why the principle should not be applied in such case.

■ ■ In other jurisdictions such evidence has been admissible. In State v. Calkins, 50 Wash2d 716, 314 P2d 449, an auction sale was involved and the court found that the public auction was free and voluntary and if the property was located close to the condemned property, evidence of such comparable value could be introduced. In Application of Housing Authority of the City of Bayonne, 21 NJ Super 254, 91 A2d 106, the question which was involved was the admissibility of evidence of a purchase at public auction of the same land being condemned. Such evidence was found to be admissible. We believe that this is a sound rule, if the sale is a free and open sale, and if conditions as to the property are substantially the same as they are later at the time of the filing of the condem-

194

nation petition. We, therefore, believe it was proper to admit evidence of the auction sale in the instant case.

 The next issue for consideration was whether the trial judge correctly refused to admit evidence as to any sales of property in the area which occurred after the date of petition for condemnation. As we have indicated, the property owner attempted to introduce evidence of two sales, one 14 weeks after the filing of the petition and the other 5 months later. The court in denying the right to introduce such evidence stated that the diamond interchange proposed presented a new value influence as to commercial value of property in the area and, therefore, that evidence of sales after the time of filing of the petition would not be properly admissible. The property owner cites the City of Chicago v. Blanton, 15 Ill2d 198, at 202, 154 NE2d 242, where the court stated that to aid in establishing value the court has consistently held that evidence of voluntary sales of similar parcels occurring in the same vicinity at or about the filing time are admissible unless such proof causes a confusion of issues which offsets the benefits to be derived therefrom. In that case there was a petition to condemn land for a school in an area where there was a shortage of schools. The court, however, in refusing to admit evidence of sales after the condemnation action was filed stated (at page 203):

> "This being the case, it is only reasonable to assume that the filing of the instant condemnation action to acquire property for such a school would materially affect the price of neighborhood real estate by presenting a new valuation influence which had not previously existed."

Certainly this is the situation in the case before us. When it became known in the area that there was to be an Interstate Highway and there would be access from the Interstate Highway to this area, this necessarily would

195

have a material effect on land values in the area. The sale which occurred 14 weeks after the petition was made to the Texas company which operates gas stations, so that it could be reasonably deduced that the location of the Interstate Highway had a material influence on land values in the area. As the court had noted in the Blanton case (cited above) admission of evidence rests largely in the discretion of the trial court and its decision should be reversed only where such discretion had been clearly abused. On the basis of the record before us, we do not believe that there was an abuse of discretion by the trial judge in refusing to admit such evidence.

■ It is vigorously contended that the trial judge was in error in refusing to conclude as a matter of law that the verdict of the jury was the result of passion or prejudice and was clearly against the manifest weight of the evidence. Both parties to this cause quote from the case of County of Cook v. Colonial Oil Corp., 15 Ill2d 67, at 69, 153 NE2d 844, where the court said:

> "It is well established that where an award is made by a jury in a proceeding in which the evidence is conflicting, and the jury views the property and fixes the amount of compensation within the range of the evidence, such a verdict will not be disturbed unless there has been a clear and palpable mistake or the verdict was the result of passion or prejudice."

Although there was an attempt to discredit the qualifications of appraisers for the State, it was clearly shown that the key witness, a Mr. Kelly, was a resident of Joliet all of his life and had been in the real estate business for 24 years. His testimony disclosed that he had a great deal of experience in the field of appraisals and particularly in condemnation situations. The other two appraisers were likewise competent. On the record, there was sufficient testimony by witnesses to substantiate the jury

verdict. While there was quite a difference in valuations by the appraisers, the verdict of the jury was within the area fixed by the appraisers. In Department of Public Works and Buildings v. Todaro, 90 Ill App2d 245, 233 NE2d 61, the State sought to condemn a piece of property eight and one-half feet wide by 100 feet long on the east side of the property of the owners in that litigation. One witness for the State valued the strip to be taken and the necessary easement for construction at $1,140 while another valued the strip at $940. Two witnesses for defendant valued the damages at $18,710 and $18,050 respectively. The jury award of $1,250 was affirmed. The court answered the contention that the award was so inadequate as to warrant a new trial by saying:

> "The wide variance of value ascribed to the property is not unusual in condemnation cases. The award for compensation was within the limits of the testimony. Damages awarded by a jury in a condemnation proceeding will not be disturbed where the evidence is conflicting, the jury has viewed the premises, and the amount of compensation fixed is within the range of evidence, unless there appears to have been a clear and palpable mistake or the verdict was the result of passion or prejudice."

In Forest Preserve Dist. v. Galt, 412 Ill 500, 107 NE2d 682, where the lower appraisal was favored by the jury, the court stated (at page 503):

> "We take notice that in this case, as in most other condemnation proceedings, there is a wide variance between the values accorded to the property by the witnesses for the appellee and the witnesses for the appellants. This variation in value is no basis for a reversal of the award of the jury in cases of this type."

Under the precedents in this State and in view of the record in this cause, we do not believe we would be justified in disturbing the verdict of the jury.

■■ The final issue for consideration is whether the statements by attorney for the State that defendant had a special use for the property as a parking lot was such prejudicial error as to require a reversal. The attorney was obviously wrong in making the response to the argument which was precipitated by the argument of defendant's attorney. The error, however, was corrected when the trial judge sustained the motion of defendant to strike the statement from the record and to instruct the jury to disregard the statement, which was all the relief requested by defendant. It is difficult in fact to conclude that the statement was of such prejudicial nature that the mere fact that the jury heard it should be grounds for reversal. Since the court correctly allowed the motion to strike and instructed the jury to disregard it we feel that there was no reversible error by reason of the making of such statement.

Since we find no reversible error in the record, the judgment of the Circuit Court of Will County will, therefore, be affirmed.

Affirmed.

STOUDER and SCHEINEMAN, JJ., concur.