City of Chicago in Trust for the Use of Schools, Plaintiff-Appellee, v. Albert J. Schorsch Realty Co., Inc., et al., Defendants, National Bank of Albany Park in Chicago, as Trustee Under Trust No. 11–1030, Individually and as Successor in Interest to Exchange National Bank of Chicago as Trustee Under Trust No. 15166, and La Salle National Bank of Chicago as Trustee Under Trust No. 35232, Successor in Interest to John Przywara and Josephine Przywara, His Wife, Defendants-Appellants,

Consolidated with

City of Chicago in Trust for the Use of Schools, Plaintiff-Appellee, v. John Przywara, et al., Defendants, National Bank of Albany Park in Chicago, as Trustee Under Trust No. 11–1030, Individually and as Successor in Interest to Exchange National Bank of Chicago as Trustee Under Trust No. 15166, and La Salle National Bank of Chicago as Trustee Under Trust No. 35232, Successor in Interest to John Przywara and Josephine Przywara, His Wife, Defendants-Appellants.

Gen. No. 54,685.

First District, First Division.

June 15, 1970.

Rehearing denied August 3, 1970.

Green, Murnighan & Kane Associates, of Chicago, for appellants.

James W. Coffey and Frank S. Righeimer, of Chicago (Richard E. Girard, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is an eminent domain proceeding commenced in 1965 by the Board of Education of the City of Chicago to acquire for school purposes five parcels of land re-

ferred to as Parcels A, B, C, D and E. The instant appeal concerns Parcels B, C and D, which consist of approximately nine and one-half acres of vacant land except for an old frame house. These three parcels were the subject of a prior appeal in which this court reversed judgment in favor of plaintiff and remanded the cause "with directions to vacate the order striking the traverse and motion to dismiss of National Bank of Albany Park, to vacate the order denying leave to Exchange National Bank to file its traverse and motion to dismiss and to conduct such proceedings as may be required." 95 Ill App2d 258, 263, 238 NE2d 434.

The mandate of the Appellate Court in the prior appeal was filed in the trial court on October 22, 1968. On remand and after hearing evidence, the trial court (1) overruled and denied defendants' motions to dismiss; (2) denied leave to defendants to file a petition to establish a new date to fix the valuation of the property involved; and (3) denied leave to defendant National Bank of Albany Park to file a cross petition for damages to a remaining five-acre tract immediately north of and contiguous to Parcel D of these proceedings. In a valuation trial a jury verdict fixed the value of Parcel B at $165,000, C at $92,000, and D at $92,000. Judgments were entered on the verdict.

Defendants appeal from orders striking portions of the motions to dismiss, overruling and denying the motions to dismiss, denying leave to file certain petitions, and from the verdict and judgments entered thereon. On appeal defendants contend they did not receive a proper hearing on their motions which were either dismissed or denied. Also, because of prejudicial trial errors, they did not receive a fair valuation trial.

Initially considered is defendants' contention that the trial court erred in striking their motions to dismiss and

violated their right to due process of law. The motions alleged the following:

"1. Plaintiff failed to prepare any preliminary plans for the construction of a school or to decide on what type of school it would construct on the proposed site.

"2. Plaintiff, prior to the initiation of the instant suit, began a prior suit seeking to condemn a site slightly less than three acres of land in the immediate vicinity which was subsequently dismissed. Plaintiff also had initiated a suit prior to this instant suit, seeking to condemn a site of approximately 19 acres, also in the immediate vicinity. This second suit also was dismissed by the plaintiff prior to beginning this suit. By reason of the premises the attempt to take herein demonstrates an attempt to take an excessive amount of property.

"3. No reports, surveys, or other basis for a recommendation for the taking, or reason why plaintiff should proceed differently in this suit from its proceedings in the two suits heretofore referred to, appear anywhere of record.

"4. Plaintiff has failed to comply with an essential condition precedent to the filing of its Petition herein in that it has failed to comply with the provisions of Section 11–12–4 of Chapter 24 of the Illinois Statutes.

"5. Since plaintiff relies on the exceptions contained in Section 42 of Chapter 102 of the Illinois Revised Statutes relating to Meetings of Public Agencies to keep from the record any information which enters into its purported exercise of discretion to acquire the real estate here involved, their failure to comply with the duties of the statute requiring their ref-

erence to the Chicago Plan Commission constitutes an abuse of power and prevents any reasoned decision or check or balance on the administrative actions of the Board of Education as plaintiff herein. It further prevents any review which might serve to uncover issues which were ignored or inadequately treated by the Board of Education; and refuses to this defendant the constitutional and statutory protections intended by the Illinois Legislature in the Plan Commission Statute. As a result thereof, this defendant is deprived of due process in that there is a complete absence of any review of plaintiff's decision to take this property."

Thereafter, plaintiff filed a motion to strike the motions to dismiss on the ground that the motions were legally insufficient. On December 20, 1968, the trial court entered an order which included directions to plaintiff to respond to certain paragraphs of the provisions of defendants' Request to Admit Facts, which had been served on plaintiff on December 16, 1968. On January 3, 1969, and after a hearing, the court entered an order striking paragraphs 1, 3, 4, and 5 of defendants' motions. On January 6, 1969, the remaining portions of defendants' motions to dismiss were denied, after hearing the testimony of witnesses and considering various resolutions of the Board of Education relating to the acquisition, the responses to the Request to Admit Facts which related to the various sites involved, and arguments of counsel.

Defendants contend that the hearing on their motion to dismiss did not fulfill the minimal requirements of due process of law. Defendants argue that "plaintiff in seeking to condemn this property has failed to show any use of discretion in making its determination and additionally abused its discretion in taking an excessive amount of property." They assert that the reasoning

of plaintiff's motion to strike was that defendants had no right to inquire into plaintiff's basis for its exercise of eminent domain and that the attempts at discovery by defendants was inhibited by this position, especially as to the question of why the Board of Education changed at least the size of its site on five occasions.

Plaintiff contends that the selection and acquisition of the public school site here involved was within the discretion of the Board of Education. It asserts that it is a long established rule of condemnation law that the exercise of the power to condemn is a legislative and not a judicial question, and the determination by the Board of Education to acquire the subject school site should not be disturbed by the court.

After examining the arguments and authorities cited by both sides, we conclude that an extended discussion would unnecessarily lengthen this opinion. The guidelines to be used here are sufficiently set forth in City of Chicago v. Vaccarro, 408 Ill 587, 97 NE2d 766 (1951); Cafeteria Workers v. McElroy, 367 US 886, 6 L Ed2d 1230, 81 S Ct 1743 (1961); and an article by Chief Justice Traynor of the California Supreme Court in 17 Vand L Rev 109.

In City of Chicago v. Vaccarro, it is stated (p 596):

> "This court has held in an unbroken line of decisions that where the right to condemn exists, and the property is subject to the right of eminent domain and is being condemned for a public use, and the right to condemn is not being abused, courts cannot deny the right to condemn on the ground that the exercise of the power is unnecessary or not expedient, as the determination of that question devolves upon the legislative branch of the government and is a question which the judicial branch of the government cannot determine; and that in such

58

cases courts may only rightfully determine whether a petitioner has the power to exercise the right of eminent domain, whether the property is subject to the right of eminent domain and is being taken for a public use, whether the power is being abused, as by the taking of an excessive amount of property, and other kindred questions which do not involve a determination of the necessity or expediency of the taking of the lands sought to be condemned."

And at page 597:

"The general rule is that where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted. . . . An abuse of such power, however, will not be tolerated, and if no necessity for its exercise exists, or if it appears that the quantity of the property sought to be taken is grossly in excess of the amount necessary for the public use, the court will not permit the land to be taken."

In Cafeteria Workers v. McElroy, it was stated (p 895):

"As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. Where it has been possible to characterize that private interest (perhaps in oversimplification) as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required."

59

Justice Traynor in his article remarked (p 117):

"One is moved to add that these are basic concerns of a court in the review of decisions of administrative agencies. A person has not had a fair hearing if the one in authority, given discretion to adjudge the case in the ample terms of a general policy, has exercised his discretionary power not with the realistic appropriateness that is the very justification of such power, but with such harsh inappropriateness as to mock the meaning of discretion. A court reviewing an alleged abuse of discretion, and finding a prima facie case of arbitrariness, must be alert to ascertain whether or not there emerges from the record some reasonable explanation for the administrative decision. We cannot take it for granted that because an authority is, he thinks. The thought process, or the absence thereof, of the one in authority has more than once been the key to determining the issue of due process in administrative proceedings."

Summarized, the motions to dismiss were substantially based on the following grounds: (1) preliminary plans for construction for a school or type of school were not made; (2) the taking was excessive; (3) no reports, surveys, or other basis why plaintiff should proceed in this suit differently than in the two suits it heretofore dismissed appear of record; (4) plaintiff did not consult with the Chicago Plan Commission; and (5) plaintiff has kept from the record information which entered into its exercise of discretion in seeking to acquire the school site.

▪▪▪ After examining this record, we find that in the instant case the filing of the resolution of the Board of Education to acquire the subject property was sufficient. No plans, reports or surveys were required to be prepared as a condition precedent to plaintiff's exercise

of the power to acquire a school site. See 26 Am Jur2d, Eminent Domain, § 117; Village of Depue v. Banschbach, 273 Ill 574, 113 NE 156 (1916). The dismissal of two previous suits by plaintiff was not relevant to the determination that the taking was excessive. Plaintiff was not required to consult with or secure the approval of the Chicago Plan Commission. We agree with the remarks of this court in the first appeal of this cause (95 Ill App2d 264, 279):

> "The statute expressly provides that the plan commission's disapproval does not bar the proposed action. We believe that the statute taken as a whole indicates that the requirement of submission to the plan commission is not mandatory and failure to submit the proposed action to the commission does not bar condemnation."

■ Furthermore, plaintiff was not required to reveal or record the information or motives that went into its decision. In Oak Park National Bank v. Village of Broadview, 27 Ill2d 151, 188 NE2d 679 (1963), it is said (p 155):

> "The motives that may have actuated those in authority are not the subject of judicial investigation."

In Deerfield Park Dist. v. Development Corp., 22 Ill2d 132, 174 NE2d 850 (1961), it is said (p 140):

> "As we stated in Ligare v. City of Chicago, 139 Ill 46, 28 NE 934, in a condemnation case the purpose for which the power of eminent domain is exercised may be questioned, but 'the motives that may have actuated those in authority are not the subject of judicial investigation.'"

■ Finally, the trial court did not err in refusing defendants leave to amend their motions to dismiss. Such was a matter for the sound discretion of the trial

judge, and there is nothing in this record to show that he abused his discretion. We hold the trial court was correct in striking or denying defendants' motions to dismiss and in so doing defendants' right to due process of law was not violated.

Subsequent to the denial of the motions to dismiss, the court denied leave to defendants to file a petition alleging substantial change in the value of their property and asking for a new valuation date. Also, the court denied leave to defendant National Bank of Albany Park to file a cross petition alleging damages to its five-acre parcel of property immediately north of and contiguous to Parcel D. The court then set the cause for a valuation trial as of the date of the filing of the condemnation petition in 1965.

At the valuation trial before a jury, the first witness for plaintiff was Charles A. Hodlmair. He had been in the real estate brokerage, sales, management, appraisal and construction business all his life, and was well acquainted with the area in question. He testified that the area of the subject parcels is mostly newly built up, particularly on the south and east, as a single family residential neighborhood, for which it is zoned and best suited.

Hodlmair further testified that the highest and best use of Parcels B, C and D as of July, 1965, was single family residence use. He based his opinion on the character and condition of the property itself, the size of the parcels, the surrounding neighborhood, the single family residence developments surrounding the subject property on three sides, the situation with respect to bringing in sewer and water, the necessary site preparation, the possible uses of the property, the mortgage market possibilities, and the most feasible layout of the lots on these parcels for subdivision purposes, including the development problem with Parcel B caused by the one-half

acre taken out for Parcel A. Other difficulties in developing the condemned parcels for use arose from the fact that there was a one street access only, and that Cumberland Avenue at the west is a 40-mile an hour speed limit road. Also, for Parcel B it would be necessary to put in a street with a cul-de-sac or loop in order to get in and out, thereby reducing the amount of land for building use.

Hodlmair's valuation testimony was $85,000 for Parcel B and $58,000 each for Parcels C and D. In arriving at these figures he took into account the sales price of comparable land known to him, the market, the cost of improving the land and the maximum that would be paid for it on the market after improvement. The vacant property across Cumberland didn't have any particular bearing on his opinion. When asked if he took into account whether there was a reasonable probability of rezoning these three parcels, he stated, "I wouldn't even consider it."

The second valuation witness for plaintiff was Herman O. Walther, who testified that he has been in the real estate business for forty years, and has appraised all kinds of real estate during that time. He testified that in his opinion the highest and best use of the subject parcels as of July 14, 1965, was for single family residence use in keeping with the adjoining developments, all single family residences, and with the zoning to the east, south and north of the property. He valued Parcel B at $125,000 and Parcels C and D at $70,000 each as of the date of July 14, 1965. The facts he took into consideration in arriving at these figures included the location of the property, the transportation, the 200 or so single family homes that adjoined on the northeast, east and south of the subject parcels, the single family zoning and the highest and best use of the subject property, its accessibility to churches, schools, shopping

areas, transportation, and his familiarity with the real estate market and his experience in the real estate business.

On cross-examination he testified that it would be highly improbable that Parcels B, C, and D could be rezoned. He stated that "assemblage" is a process so that small parcels are made into a larger parcel of land under one ownership, whether through purchase or option. He finally stated that the R-4 zoning across the street had no affect on the subject property.

The third valuation witness for plaintiff was John J. McNamara, who testified that he has been in the real estate business as a broker and an appraiser for forty-two years. He stated he was familiar with real estate in the vicinity of the subject parcels; that temporary classrooms have been erected south of the subject property at Cumberland and Balmoral, and that the subject parcels were on the east surrounded by a residential development of single family dwellings. He testified that in his opinion the highest and best use of Parcels B, C, and D, as of July 14, 1965, would be for development as a single family residential development, based on property that these parcels are surrounded by and that the subject parcels are zoned R-2, single family residence. His opinion of value for Parcel B was $105,000 and $72,000 each for Parcels C and D. In arriving at these figures the elements he considered included the size and shape of the parcels, the use to which they could be put under their present zoning of R-2, and his experience in the real estate business. On cross-examination he testified that he did not take into account the reasonable probability of rezoning the subject parcels because they were strictly R-2 zoning.

Mitchell Kobelinski, a witness for defendants, testified that he was a lawyer and banker and has had extensive experience in assemblage and development of real estate of all types. He identified defendants' Exhibit 1

64

as a zoning map of the City of Chicago and testified that no rezonings occurred in the area of the subject parcels for the period July 14, 1965, to February 16, 1966, the date of the document. As of July 14, 1965, he owned Parcel C, had an option to purchase Parcel D and owned a five-acre parcel immediately north of D. He had an opinion that the parcels each would be best used for multi-family residential use with the possibility of alternate commercial use along the Cumberland Avenue frontage, and that the value of Parcel B at its highest and best use was between $340,000 and $365,000 and Parcels C and D at their highest and best use was $195,000 to $200,000. His opinion of the values of the subject parcels at their present zoning was $290,000 for Parcel B, and for Parcels C and D each $160,000 to $165,000. The factors he took into account in arriving at his opinions of value included rezoning and a demand for multi-family housing.

On cross-examination Kobelinski testified that he has had an interest in the neighborhood since 1962 when they first bought property there. He was asked what he paid for the five-acre tract immediately north of and contiguous to Parcel D, which was objected to. Over this objection he testified that he paid $164,000. On re-direct he testified that he did not seek rezoning of Parcel C or the five acres north prior to July 14, 1965, because at that time the last parcel of their assemblage had not been acquired. It was not economically advantageous.

Carl Gardner, a city planning consultant, testified for defendants. He stated that he was familiar with the subject property, and told specifically which areas of influence affected it. He described the established trend in the area toward multiple-family 6, 8 and 12 units and stated that Cumberland Avenue is in no way a zoning barrier. He stated the properties on either side of a given street should be the same use or a comparable

use, at least a compatible use. He further stated that assuming that Parcels C and D were assembled with the five-acre tract immediately north, that his opinion of the highest and best use for that site would be a planned residential development under the zoning classification R-4. He also stated that the highest and best use of Parcel B would be the same.

Richard Roppolo testified for defendant that he was a real estate broker and was familiar with the subject property. He was asked to make an appraisal of Parcels B, C and D, and his opinion was that the highest and best use of the property was a combination of commercial and multiple. He valued Parcel B at its highest and best use as $460,000 for what might be commercial and $300,000 for the multiple. His opinion of Parcels C and D at their highest and best use was $250,000. The values of the parcels at their present zoning of R-2 was $273,000 for Parcel B and $141,000 each for Parcels C and D.

Vincent Oliva testified for defendants as to the sale of allegedly similar property. The deal was closed and the money paid subsequent to July 14, 1965. However, upon objection by plaintiff, the court did not admit the sale into evidence.

Albert Schorsch, Jr., testified for defendants that he was a real estate broker and also a subdivider and builder. His opinion of the highest and best use of each of these parcels would be under general residence zoning, R-4, with apartment units. His opinion of the value of Parcel B at its highest and best use would be $351,200 and $202,000 for Parcels C and D at their highest and best uses. The value of the Parcels at their present zoning was $242,000 for Parcel B and $141,000 each for Parcels C and D. He took into account the upward trend of values of land which has put the market of the property beyond the reach of the single family home developer to a point where it would have to be developed

as rental or general residence type property; and that the trend throughout the city has been toward the demand for more apartments.

On cross-examination he stated it would be necessary to get the zoning changed to use this property under R–4 and described the procedures for obtaining a rezoning.

Eugene Kuberski testified for defendants that he is a zoning plan examiner for the Cook County Building Department. He examined the five-acre tract of property in Norwood Park Township at Cumberland Avenue immediately south of Bryn Mawr with regard to the number of residences a person could put on it. As of April, 1962, one residence could be placed on that parcel of property.

Defendants offered into evidence Exhibits 2 through 7, which were zoning ordinances of the City of Chicago relating to specific rezonings in the area covered by the zoning map. The court denied admission to Exhibits 2 through 6 inclusive and admitted Exhibit 7 into evidence. As previously noted, the jury returned a verdict awarding compensation and judgment was entered on the verdict.

Considered next is defendants' contention that they were not afforded a fair valuation trial because of prejudicial rulings of the trial court. They first complain that they were not allowed to present their theory of "assemblage" for the jury's consideration and that this evidence would have greatly shown an increase in value of the subject property. They note that if Parcels C and D were assembled with the five-acre tract near Parcel D, that compact nine-acre parcel would be worth more than the three smaller individual parcels. The record in this regard shows that in November, 1962, the owners of Parcels C and D, Walter and Florence Branda, entered into an option agreement where they gave Mitchell Kobelinski and Ted Szywala or their company an option

right to purchase one-half of Parcel C on or before May 1, 1963; the other half of Parcel C on May 1, 1964; one-half of Parcel D on May 1, 1965, and the other half on May 1, 1966. At the time of the filing of the Petition to Condemn, the optionees had acquired the two halves of Parcel C but had not acquired any of Parcel D. The ownership of the parcels at the time of the filing was thus as follows: Parcel B was then owned by John and Josephine Przywara; Parcel C was then owned by the National Bank of Albany Park under Trust 11–1030, whose beneficiaries were Mitchell Kobelinski and Ted Szywala or their company; and Parcel D was then owned by the Exchange National Bank under Trust No. 15166 as trustee, whose beneficiaries were Walter and Florence Branda. During the direct examination of Kobelinski, he was questioned concerning his ownership of property in the vicinity of the subject parcels. He testified that he owned Parcel C and "had an option" to purchase Parcel D. A colloquy took place and the witness stated: "I answered two questions, Judge. One I said we had an option to purchase Parcel D and we had title to the rectangle immediately north of Parcel D." The Court: "Okay, objection sustained as to 'had an option to purchase.'"

Defendants assert that the trial judge struck the answer "had an option" in such a manner and so out of context that the jury readily may have understood it was to disregard any evidence by the defendants relating to the claim of an option throughout the trial, and that such was prejudicial. They assert that evidence of assemblage would tend to show a greatly increased market value. They also assert that defendants' instruction No. 8 concerning the theory of assemblage was improperly refused. Authorities cited include County of Cook v. Holland, 3 Ill2d 36, 119 NE2d 760 (1954), and Union Electric Power Co. v. Sauget, 1 Ill2d 125, 115 NE2d 246 (1953), where it was stated (p 130):

68

"As to the evidence, which must be viewed in the light that its purpose is to establish just compensation for the land, it has long been the rule that parties to a condemnation proceeding have the right to adopt their own theories as to the best and highest use of the land taken and each may introduce evidence without being bound by the theory of the other. . . . Since neither party is bound by the theory of the other, it follows that the court is not limited to admitting evidence which embraces the theory of one party only."

██ We find that no prejudicial error was committed by the trial court in its ruling. Kobelinski was asked the question, "Did you *own* any other real estate in the immediate vicinity of this property?" It was improper for the witness to answer that he *owned* Parcel D, because an option creates no interest in the land. See Keogh v. Peck, 316 Ill 318, 328, 147 NE 266 (1925).

██ ██ Also, we find that defendants were not prevented from presenting their theory of assemblage to the jury. The record shows that Kobelinski testified that he was part owner of the Ridgeway Construction Company, which owned Parcel C and had an option to purchase Parcel D. Also, defendants' witness Gardner, over objection, was allowed to testify as to the highest and best use of Parcels C and D as being assembled. Finally, it was not prejudicial error to refuse defendants' instruction No. 8. There was no evidence that assemblage of Parcels C and D would affect the value of the parcels.

Defendant National Bank of Albany Park, as Trustee for Kobelinski and Szywala, next contends that it was erroneously denied leave to file a cross petition and have damages to a remaining five acres immediately north of and contiguous to Parcel D assessed. Defendant bank owned this five-acre tract, but it was not a part of the

condemnation proceedings. It notes that defendant National Bank of Albany Park established sufficient rights in the ownership of Parcel D which should have been sufficient to have damages assessed, presumably because it considered all of the parcels together, including the five acres north of Parcel D, more valuable as a single tract. Defendants maintain that they were diligent in attempting to assert their rights and at all times, when proper, asked the court to treat the property as a tract or allow damages to the remainder or both.

In the Eminent Domain Act (Ill Rev Stats, c 47, § 1 et seq.), it is provided:

> "11. Cross Petition.] § 11. Any person not made a party may become such by filing his cross petition, setting forth that he is the *owner or has an interest in property,* and which will be taken or damaged by the proposed work; and the rights of such last named petitioner shall thereupon be fully considered and determined." (Emphasis added.)

■ We find that it was proper to deny leave to defendant National Bank of Albany Park to file its cross petition. In the instant case any possible damage to the five-acre tract north of Parcel D necessarily depended on whether defendant was the "owner or has an interest" in Parcel D. However, as shown previously, at the time of the cross petition defendant merely had an option to purchase Parcel D and did not "own" it. In City of Chicago v. Equitable Life Soc., 8 Ill2d 341, 134 NE2d 296 (1956), it is stated (p 348):

> "It is elementary that a mere intention on the part of the owner to put properties to a common use is not sufficient to allow a cross petition in a condemnation action, but such properties must be considered as they existed at the time the proceedings were commenced, . . . and whether or not the cross

70

petition is proper is a question of law which must be decided by the court. . . . Under the facts and circumstances of this case, we are of the opinion that the properties in question are not so interrelated as to warrant their consideration as a single unit."

Defendants next contend that the trial court erred in refusing to allow defendants to introduce five or six ordinances which showed that recently rezonings of property of a comparable use directly across the street had occurred. They note that the only rezoning ordinance which was admitted showed a rezoning to B–5–1 and the jury could reasonably infer that the other exhibits offered probably related to identical matters. They further note that the allowance of those exhibits "not only would have substantiated Gardner's testimony but showed what usages the city felt were then presently available to the property and further, would have substantiated the testimony of each of defendants' witnesses." They further note that the relevancy and materiality of the zoning ordinances should not be questioned.

Defendants further argue that counsel for plaintiff remarked to the jury that no attempts at rezoning were made until the Board of Education sought to take the property. They note that the excluded exhibits would have contradicted these assertions. Authorities cited include Lombard Park District v. Chicago Title & Trust Co., 103 Ill App2d 1, 242 NE2d 440 (1968), and Dept. of Public Works v. Rogers, 39 Ill2d 109, 233 NE2d 409 (1968).

In Lombard Park District v. Chicago Title & Trust Co., it is stated (p 8):

"Without opening wide the floodgates for such testimony, courts have usually taken the view that a prospective purchaser, on the open market, on a proper showing that a change in zoning was reasonably probable in the reasonably near future, would

consider the probability of such change in valuing the property, and that courts in condemnation proceedings should also receive such evidence."

In Dept. of Public Works v. Rogers, it is stated (p 114):

"Were the zoning ordinance inflexible, the trial court could very well have concluded that there was no probability of rezoning. However, the ordinance was proved to be flexible and there was sufficient basis for its introduction in evidence in support of the reasonable probability of the rezoning theory. The fact that the rezoning of the fifty-acre tract was for a different purpose and for a much larger area does not destroy its admissibility on the basis that it was irrelevant and immaterial."

Plaintiff contends that the excluded ordinances (defendants' Exhibits 2 through 6) were concerned with an area entirely different from that in which the subject parcels are located and were mostly R–4 zoning for multi-apartment and business uses. We agree with plaintiff's assertion that "defendants were not thereby deprived of their right to show a theory of reasonable probability of rezoning Parcels B, C, and D for the reasons that (1) all the defendants' witnesses were permitted to testify to valuations of the condemned property on the basis of a change in zoning there from R–2 to R–4; (2) both the owner Kobelinski and the witness Schorsch testified for defendants to actual rezonings west of Cumberland from R–2 to R–4 to business; (3) a rezoning ordinance of property at the northeast corner of Bryn Mawr and Cumberland, defendants' Exhibit 7, was admitted into evidence; (4) in his final argument to the jury defendants' attorney repeatedly referred to these rezonings on the west side as evidence to be considered on the defendants' theory that there was a reasonable prob-

ability of securing rezoning of the subject parcels which he argued emphasized the correctness of the valuation testimony given by the defendants' witnesses based on R–4 zoning."

■ We conclude that defendants were not prejudiced by the court's exclusion of their zoning exhibits. They were in fact permitted to present their theory of a reasonable probability of rezoning to the jury. We find no error here.

■ Defendants next contend that the court erred in refusing to allow into evidence a sale of a one and one-half acre tract zoned R–1 in the area. The record shows that this parcel was not comparable to the parcels involved in the condemnation suit. We find no error here.

■ ■ Defendants further contend that permitting petitioner to introduce a sale during cross-examination over objection and to introduce a sale upon rebuttal over objection where no contract was produced or foundation of similarity established are further examples of error prejudicial to defendants. We have examined the record and find these parcels had sufficient similarity for the court to permit counsel for plaintiff to go into the sales on cross-examination. Also, the terms and conditions of the contract of sale were not important. The only important thing was when the land was sold and what it was sold for. Forest Preserve Dist. v. Kean, 298 Ill 37, 131 NE 117 (1921). We find no error here.

In City of Evanston v. Piotrowicz, 20 Ill2d 512, 170 NE2d 569 (1960), it is stated (p 522):

> "As we have also stated in the past, no fixed or general rule has or could be laid down which governs the degree of similarity that must exist between the properties sold and that condemned to make evidence of the sale or sales admissible; rather, the admissibility of such evidence must in each

instance be determined by the trial judge within the proper limits of his discretion."

Defendants further contend that they were improperly denied leave to file a petition by which they sought to establish a new date for valuation of the premises for the condemnation trial. The petition essentially alleged that since the time of the petition on July 14, 1965, until the time for trial, February 3, 1969, the market value of all the property in the vicinity of the subject parcels had substantially increased. Defendants assert that "the petition raised a serious question as to whether using a date of July 14, 1965, under the circumstances of this case would constitute just compensation within the meaning of the constitutional mandate." Defendants' authorities include Sanitary District v. Chapin, 226 Ill 499, 80 NE 1017 (1907), and Illinois Cities Water v. City of Mount Vernon, 11 Ill2d 547, 144 NE2d 729 (1957). In Sanitary District v. Chapin, it is stated (p 504):

> "The rule so established, that the value of property is to be fixed as of the date of filing the petition, has been consistently followed ever since. . . . The filing of the petition is the first actual step toward devoting property to a public use, and in ordinary cases that time is as fair and just to both parties for fixing the value of the property as any that could be adopted. At any rate, the rule is firmly established; but if it should be applied to a case like this, where the owner has not been brought into court and no steps have been taken for several years, during which the property has greatly advanced in value, it would result in wrong and injustice."

Plaintiff, on the issue of the proper valuation date to be used here, asserts that the trial court rule correctly followed the long-established rule and procedure in Illi-

nois. In City of Chicago v. Riley, 16 Ill2d 257, 157 NE2d 46 (1959), it is said (p 264):

> "It is well settled that the value of the property must be determined as of the time of filing the petition for condemnation."

In City of Chicago v. Blanton, 15 Ill2d 198, 154 NE2d 242 (1958), it is stated (p 202):

> "It is of course elementary that eminent domain proceedings were designed to afford the property owner a means by which he would receive in money the full, fair cash market value of the condemned land under the conditions which existed, not at time of trial, but at the time the eminent domain proceedings were instituted."

▮▮▮ We find that defendants have not asserted sufficient facts to entitle them to a new valuation date. Defendants' cases are distinguishable on their facts. The record indicates that the attorneys for both sides have tried to expedite the proceedings as much as possible and within their professional responsibilities to their clients.

▮▮▮ Defendants next contend that the jury was influenced by passion and prejudice as exemplified by the statements of counsel for plaintiff in closing argument. We find no merit in this contention. The remarks made in County of Cook v. Colonial Oil Corp., 15 Ill2d 67, 153 NE2d 844 (1958), apply here. There the court stated (p 75):

> "Counsel for defendant also characterizes the closing argument of petitioner's counsel as 'unfair, insulting, full of ridicule of respondent's witnesses and counsel, and so insinuating and vindictive as to be highly prejudicial to the respondent.' First of all, counsel for defendant, who is admittedly experienced in condemnation, made no objection to any of the

75

opening argument of counsel for petitioner and no objection to any of the supposedly objectionable remarks made by petitioner's counsel in his final argument. We have consistently held that experienced counsel cannot take a chance of failing to make objections and then, upon receiving what they consider an adverse jury verdict, claim error."

 Defendants finally contend that the cumulative errors denied defendants a fair trial. They assert that "the jury verdicts were approximately $10,000 or so less than in the first trial from which the plaintiffs originally took an appeal. The extreme prejudice which occasioned such a low verdict is confirmed by plaintiff's earlier attempting to waive a retrial after these defendants' motions to dismiss were over-ruled and return again to the jury verdict in 1966 from which they had originally taken an appeal."

After examining this record, we believe defendants received a fair trial on the proper issues without prejudicial error, and the verdict was within the range of the testimony. In School Trustees v. LaSalle National Bank, 21 Ill2d 552, 173 NE2d 464 (1961), our Supreme Court said (p 556):

> "This court has repeatedly held that where the jury has viewed the premises and the amount fixed is within the range of the evidence, the verdict of the jury will not be disturbed unless the record clearly shows that it has been influenced by passion or prejudice or unless there was a clear and palpable mistake."

These remarks apply here, and the judgment of the trial court is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.