MORTON GROVE PARK DISTRICT, Petitioner-Appellee, *v.* AMERICAN NATIONAL BANK & TRUST COMPANY, Trustee, *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 60499

Opinion filed June 8, 1976.

Earl L. Neal and Robert Marks, both of Chicago (Henry N. Novoselsky and Allen I. Brown, of counsel), for appellants.

Foran, Wiss and Schultz, of Chicago (Thomas A. Foran and Nicholas J. Etten, of counsel), for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This appeal arises from an action brought by petitioner, Morton Grove Park District (District), to acquire under the Eminent Domain Act (Act) (Ill. Rev. Stat. 1971, ch. 47, par. 1 *et seq.*), approximately 15 acres of land owned by defendants, American National Bank & Trust Co., First National Bank of Skokie, Exchange National Bank, and Shaf Home Builders, Inc. A jury awarded defendants $1,000,000 for the land taken. Thereafter the trial court allowed the District to take immediate use and possession of the property upon depositing the full amount of the verdict

and a surety bond with the county treasurer. Defendants now appeal from both the award of compensation and the order granting the District use and possession of the property pending appeal.

As to the jury's award of compensation, defendants raise four issues for our review: (1) whether the trial court improperly excluded a Morton Grove ordinance rezoning nearby property; (2) whether the trial court erred in admitting a comparable sale offered by the District and excluding a comparable sale offered by defendants; (3) whether the trial court improperly admitted a contract for the purchase of a portion of the subject property by one of defendants; and (4) whether the closing argument of counsel for the District was so prejudicial as to require a new trial. As to the order granting the District use and possession of the property pending appeal, defendants raise four additional issues for our review: (1) whether the procedure followed by the trial court in entering that order violated defendants' right to procedural due process; (2) whether the provision of the Act regarding post-judgment possession of the property adequately safeguards defendants' right to payment of just compensation; (3) whether the scope of possession granted the District exceeded that allowed under the Act; and (4) whether the surety bond required by the trial court was in compliance with the Act.

Since defendants do not challenge the sufficiency of the evidence to support the jury's award, a detailed recitation of the evidence presented is unnecessary. At this juncture, a brief summary of the evidence presented will suffice to put defendants' contentions in context. A more detailed description of the subject property and the surrounding area will be provided when the propriety of the rulings on the comparable sales are considered.

The subject property is a rectangular tract containing approximately 12.15 acres, exclusive of dedicated streets and alleys,[1] located in the Village of Morton Grove. The southern 1.5 acres of the property is presently zoned B-2 which is most intensive commercial classification under the Village's ordinance. The balance of the property, approximately 10.65 acres, is presently zoned R-2 which allows single-family residences. For all practical purposes, the property is unimproved.

The District presented the testimony of three real estate brokers and appraisers. As to the highest and best use of the property, all agreed that the portion of the property zoned B-2 and the eastern two-thirds of the portion zoned R-2 should remain unchanged. As to the remaining one-third of the property zoned R-2, one witness testified that its highest and best use would be for townhouses under a R-3 zoning and the other two witnesses testified that its highest and best use would be for apartment units under a multiple family zoning. All thus agreed that the property

[1] The total area is approximately 15 acres.

should have commercial development, 46 single-family residences and either 54 townhouse units or 120 apartment units. One witness estimated the fair cash market value of the property at $900,000, the second at $990,000, and the third at $972,000.

Defendants presented the testimony of two planning and zoning consultants. One consultant's opinion as to the highest and best use of the property indicates that five three-story buildings containing 220 units should be placed on the western portion of the property and 145 townhouse units placed on the eastern portion of the property. The other consultant opined that the highest and best use would be a planned unit development containing 592 multifamily units. Defendants also presented the testimony of three real estate brokers and appraisers. All agreed that the highest and best use of the property would be as a planned unit development with the number of units varying between 350 and 386. If so zoned, the first appraised the fair cash market value of the property at $2,225,000, the second at $2,200,000, and the third at $2,300,000

The District also presented evidence that one of defendants had acquired 83% of the subject property only 20 months before the petition to condemn was filed. At that time, 83% of the property was purchased from a land developer for $670,000.

On the basis of that evidence, and a comparable sale to be discussed later, the jury determined the fair cash market value of the property to be $1,000,000.

Defendants initially contend that the trial court erred in refusing to admit into evidence a Morton Grove ordinance that rezoned nearby property. That property, already improved with a large commercial building and consisting of approximately 10 acres, was previously zoned B-2. Under the ordinance, approximately 4 of the 10 acres including the building remained zoned B-2, and the remaining 6 acres were rezoned under a special use permit as a planned unit development of 315 apartment units. The ordinance made the special use permit contingent on the owners making certain improvements to the existing building, providing specified parking areas and utilities, landscaping the property in a specified manner, and reimbursing the Village for certain traffic control equipment. If any of those conditions went unfulfilled, the special use permit could be withdrawn.

Both at trial, and now on appeal, defendants contend that the ordinance should have been admitted either to corroborate their theory of the reasonable probability of rezoning the subject property, or to corroborate their theory of the highest and best use of the subject property.

■■ It is well settled that when land is taken for public use by the exercise of the power of eminent domain, the measure of compensation is the fair cash market value for the highest, and best use to which the land is

available. *(City of Chicago v. Giedraitis,* 14 Ill. 2d 45, 150 N.E.2d 577; *Forest Preserve District v. Hahn,* 341 Ill. 599, 173 N.E. 763.) However, the owner is not restricted to showing the highest and best use allowed under present zoning regulations, but instead, may show a higher use under less restrictive zoning if there is a reasonable probability of rezoning. *Department of Public Works & Buildings v. Rogers,* 78 Ill. App. 2d 141, 223 N.E.2d 177, *aff'd,* 39 Ill. 2d 109, 233 N.E.2d 409; *Park District v. Becker,* 60 Ill. App. 2d 463, 208 N.E.2d 621.

In *Rogers,* the land taken was zoned residential. Defendant's theory was that there was a strong probability that the property could be rezoned for gasoline service station purposes. In support of that theory, defendant attempted to introduce an ordinance of the city of Highland Park that rezoned nearby property from residential to a shopping center classification. The trial court refused to permit the introduction of the ordinance and refused to allow any testimony with reference to the ordinance. The appellate court held the exclusion of the ordinance. The appellate court held the exclusion of the ordinance to be error, stating:

"The reasonable probability of rezoning relates to the flexibility of a zoning ordinance. The zoning ordinance here involved was shown to be flexible by the rezoning of the [nearby] property * * *. The jury was entitled to know that flexibility." 78 Ill. App. 2d 141, 145.

The Illinois Supreme Court agreed that exclusion of the ordinance was error and affirmed the appellate court, stating:

"Were the zoning ordinance inflexible, the trial court could very well have concluded that there was no probability of rezoning. However, the ordinance was proved to be flexible and there was sufficient basis for its introduction in evidence in support of the reasonable probability of the rezoning theory." 39 Ill. 2d 109, 114.

It is thus beyond peradventure that if there is a dispute as to the flexibility of the present zoning ordinance, the condemnee has the right to present evidence in support of a theory of reasonable probability of rezoning. Moreover, that evidence is not restricted to the rezoning of nearby property, but may include many different factors. *Lombard Park District v. Chicago Title & Trust Co.,* 103 Ill. App. 2d 1, 242 N.E.2d 440.

However, in the instant case, there was no dispute as to flexibility or the reasonable probability of some type of rezoning. Prior to trial, the District and defendants had entered into a stipulation that, in pertinent part, provided:

"Any party herein may offer evidence in support of its contention as to the highest and best use for which the R-2 part of the subject property is and was, on December 11, 1972, available and of the fair cash market value of the property with the aforesaid R-2

portion thereof being available for said highest and best use, provided that said highest and best use for which said party contends and offers evidence, including evidence of fair cash market value, is less restrictive under the Ordinance than an exclusively R-2 use * * *."

The stipulation was subsequently adopted by the trial court and made an order of court.

The plain meaning of the stipulation is clear: both sides agreed that a continued R-2 classification for that portion of the property presently zoned R-2 is unrealistic, and that the property would surely be rezoned to some less restrictive classification. In other words, the District was telling defendant: We will not dispute the reasonable probability of rezoning to *some* less restrictive classification; for purposes of your value witnesses, you can make that property any zoning classification you want. That defendants also interpreted the stipulation to that effect is clear from defendants' counsel's remark at trial:

"Your Honor, * * * [opposing counsel] and I both have characterized and agreed with the stipulation, and are interpreting it in the same way, that a reasonable probability of rezoning need not be established, and that all witnesses are entitled to their respective theories of the highest and best use."

On the basis of the stipulation itself and counsel's remark, it is clear that there was no dispute as to the reasonable probability of rezoning.

Conceding that fact, defendants argue that the stipulation was only meant to eliminate the necessity for a preliminary ruling by the trial court as to whether some type of rezoning was probable *(Lombard Park District v. Chicago Title & Trust Co.)*, and that the ordinance should have been admitted to corroborate their theory of *exactly what* that rezoning would be.

■■ We first note that defendants have cited no authority allowing a condemnee to proved "exactly" what classification a rezoning might result in. Once some type of rezoning had been determined to be reasonably probable, the only result is that witnesses may then testify as to a highest and best use under a less restrictive zoning classification. It is not within a witness' purview, even an expert witness, to determine exactly what that rezoning classification would be. See *Lombard Park District v. Chicago Title & Trust Co., Park District v. Becker.*

The opinions in *Rogers* offer defendants no solace. For, as earlier noted, in both opinions the courts were careful to permit evidence of rezoning only for the narrow purpose of showing a zoning ordinance's "flexibility." An additional holding of *Rogers* that the properties involved need not be similar further indicates that a rezoning of nearby property is admissible only to show a flexibility. For while similarity bears no relation to mere

flexibility, if a rezoning of nearby property was offered to establish the reasonable probability of *similar* rezoning for the condemned property, the similarities of the two properties would have obvious importance. Moreover, where, as here, the proffered ordinance has substantial conditions attached to it, the difficulty of comparison to determine exact rezoning as a reasonable probability becomes substantial. Indeed, in *Lombard,* the court cautioned against "opening wide the floodgates for such testimony * * *." (103 Ill. App. 2d 1, 8.) We find such caution well-founded, and decline to extend the holdings of *Rogers.*

In short, to permit the introduction into evidence in a condemnation proceeding of a village ordinance rezoning nearby property for a planned unit development as probative of the reasonable probability of similar rezoning for the subject property would add the matter of comparable rezonings to the matter of comparable sales. The collateral consequences in trial complexity and in likely confusion of the jury are too high a price to pay for the essentially speculative probative value on the ultimate issue of fair cash market value.

■■ We conclude that on the basis of the limiting language in the *Rogers* opinions, and in the absence of any authority to the contrary, evidence of rezoning ordinances can be admitted only to show the flexibility of the rezoning ordinance involved so as to establish the reasonable probability of some type of rezoning. Such evidence can not be used in an attempt to establish the exact classification of a reasonably probable rezoning. Since the stipulation entered into in the instant case eliminated any issue as to the reasonable probability of some type of rezoning, admission of the ordinance would serve no purpose and its exclusion was not error.

Defendants also contend that the ordinance should have been admitted to corroborate their theory of highest and best use. Much of what we have already said concerning the ordinance in relation to probability of rezoning is also applicable to defendants' argument concerning highest and best use. However, two additional comments are necessary.

■■ First, while the character of the surrounding area was certainly relevant to a determination of the property's highest and best use, we fail to understand how the terms of the ordinance itself would be relevant to such a determination. The fact that multiple-family dwellings were being constructed near the subject property was a proper factor for the jury's consideration. The fact that those dwellings were being constructed pursuant to a rather complex agreement between the owners of that property and the village would only tend to confuse the jury. It is clear from the terms of the ordinance that the special use permit was granted specifically in return for specified promises concerning improvement of an existing building and the remaining property. If any of those promises

went unfulfilled, the special use permit could be withdrawn. In the instant case, defendants make no claim that they were in a position to make such promises, or, if they were in such a position, that they would be acceptable to the Village. Additionally, it should be noted that the rezoned property initially was zoned B-2, the most intensive commercial classification under the Village's ordinance, while most of the instant property was initially zoned R-2. In short, we do not understand how the terms of an ordinance specifically designed for nearby property, differently zoned, would be applicable to show the highest and best use of the instant property. To allow the admission of the ordinance would have raised substantial collateral questions to the distraction of the jury. (See *Crystal Lake Park District v. Consumers Co.*, 313 Ill. 395, 145 N.E. 215.) The trial judge properly exercised his discretion to prevent the introduction of such collateral matters.

Second, and more importantly, defendants were allowed wide latitude in presenting their theory of highest and best use to the jury. Defendants presented five expert witnesses who testified that the highest and best use of the subject property was as a planned unit development. The number of units each would place on the property ranged from a low of 350 to a high of 592. At no time were the witnesses prevented from expressing their opinion as to any use permitted under the Village's zoning ordinance. The District's response to such plans was not that the Village positively would not allow the more intensive zoning, but rather that, even assuming a planned unit development, defendants' plans did not comply with the requirements for such a development. Throughout the trial, including closing argument, defendants vigorously presented their theory of the highest and best use of the property as a planned unit development to the jury. Under such circumstances, the exclusion of the terms of the ordinance, even if error, was harmless error. *City of Chicago v. American National Bank & Trust Co.*, 7 Ill. App. 3d 1006, 288 N.E.2d 627; *City of Chicago v. Albert J. Schorsch Realty Co.*, 127 Ill. App. 2d 51, 261 N.E.2d 711; *Park District of Highland Park v. Becker.*

Defendants next contend that the trial court erred in admitting a comparable sale offered by the District and excluding a comparable sale offered by defendants. A more detailed description of the areas involved is now necessary.

The subject property is an unimproved rectangular parcel containing approximately 12.15 acres located entirely in Morton Grove. The southern 1.5 acres is zoned B-2, the remaining 10.65 acres is presently zoned R-2. The southern boundary runs for 430 feet along the north side of Dempster Street, a major east-west thoroughfare. The western edge of the property is approximately one block east of Waukegan Road, a major north-south

thoroughfare. Directly across from the subject property, on the south side of Dempster, is a shopping center containing a Korvette Department Store, a supermarket, a shoe store, a miniature golf center, and other small stores. Directly west of the property, extending the one block to Waukegan Road, are commercial establishments consisting basically of automobile dealerships and related buildings. West of the commercial establishments that line both sides of Waukegan Road, and running west to the Village limits, are basically single-family dwellings. Directly north of the subject property is a 300-feet-wide utility easement for high power electric lines. North of this utility easement, and running north to the Village limits, are basically single-family dwellings. Directly east of the property are single-family dwellings.

The comparable sale introduced by the District was of an unimproved rectangular parcel consisting of approximately 6.75 acres located entirely within Morton Grove approximately 1½ miles from the subject property. The entire parcel was zoned R-2. The western boundary runs for 494 feet along the east side of Austin Avenue, a major north-south thoroughfare. To the west, along Austin Avenue, are modern, one-story office and industrial buildings. To the north, adjacent to the property's northern boundary, are single-family dwellings. To the east, and extending to the Village limits, are single-family dwellings. The property which is adjacent to the south is equally divided between single-family dwellings and manufacturing uses.

The comparable sale defendants attempted to introduce was of an unimproved polygonal parcel consisting of approximately 4.12 acres located entirely in the Village of Skokie approximately 4 miles from the subject property. The entire parcel was zoned for multiple-family residential use. The eastern boundary runs for 163 feet on the northwest side of Gross Point Road, a major southwest-northeast thoroughfare in Skokie. The area across Gross Point Road immediately south and east of the property extending one block is zoned for service-commercial uses. Immediately northwest of the Gross Point frontage is a restaurant, a Polk Brothers, and a Dominick's. Approximately 250 feet northeast of the property across Skokie Boulevard there is a Turnstyle store and a motel. North of those uses, approximately two-thirds to three-quarters of a mile from the property, is a 12-story Hilton Hotel and just north of that, two 12-story office buildings. As noted earlier, the area immediately south and east is zoned service-commercial, and beyond that, extending south and east, there is a mixture of single-family dwellings, duplexes, two-flats, three-flats, and four-flats. Immediately southwest and adjacent to this property, on the west side of Gross Point, is a vacant lot and southwest of that is a 10-story building utilized for low rent, elderly housing.

Proceeding further southwest, on both sides of Gross Point, the developed uses are for apartments. Directly west of the property is a park and to the west and northwest of that, single-family dwellings.

■■ The rule in Illinois is well established that evidence of voluntary sales of similar properties occurring in the same vicinity is admissible to aid in estimating the value of the tract to be condemned. *(Department of Public Works & Buildings v. Drobnick,* 14 Ill. 2d 28, 150 N.E.2d 593; *City of Mt. Olive v. Braje,* 366 Ill. 132, 7 N.E.2d 851.) However, the courts recognize that no two pieces of property are exactly alike and that economic influences are constantly changing. *(City of Evanston v. Piotrowicz,* 20 Ill. 2d 512, 170 N.E.2d 569.) Consequently, "similar" does not mean identical, but rather, only having a resemblance. *(City of Chicago v. Vaccarro,* 408 Ill. 587, 97 N.E.2d 766.) Factors to be considered in determining whether the sale property is similar to the property sought to be taken include its locality, quality, character, nature, improvements and usefulness to the property in question. *(Forest Preserve District v. Lehmann Estate, Inc.,* 388 Ill. 416, 58 N.E.2d 538; *Kankakee Park District v. Heidenreich,* 328 Ill. 198, 159 N.E. 289; *Forest Preserve District v. Yelk,* 115 Ill. App. 2d 78, 252 N.E.2d 917.) Thus, because of the many factors to be weighed, no general rule can be laid down regarding the degree of similarity which must exist between property sold and that condemned in order to make evidence of such sale proper. Rather, it has been consistently held that the admission of such proof rests largely in the discretion of the trial judge and his decision will be reversed only where such discretion has been clearly abused. *City of Chicago v. Blanton,* 15 Ill. 2d 198, 154 N.E.2d 242; *Illinois Building Authority v. Dembinsky,* 101 Ill. App. 2d 59, 242 N.E.2d 67.

■■ Applying these rules to the comparable sale property offered by the District, we find no error in the court's action in admitting into evidence the sale of such property. Both parcels, only a mile and one-half apart, were located in Morton Grove. The sale property was zoned entirely R-2 as was most of the subject property. At least two of the boundaries of each parcel are adjacent to properties improved with single-family dwellings. Both parcels have approximately equal frontage on main thoroughfares. And although both have some immediate exposure to nonresidential uses, an objective examination of the surrounding localities reveals both are located in predominantly single-family neighborhoods. Considering the locality, quality, character and nature of the properties involved, there was clearly no abuse of the trial court's discretion in admitting the District's comparable sale.

On the other hand, defendants' comparable sale was four miles from the subject property and located in another municipality. Additionally, at the time of sale, it was already zoned for a more intensive use. The subject

property could not be considered as though already rezoned, but only as though there was a reasonable probability of some type of rezoning. (4 Nichols on Eminent Domain §12.322 [1] (3d ed. 1975).) Defendants' comparable sale had no adjoining single-family uses, had substantially less frontage on a main thoroughfare and was barely one-third the size of the subject property. Most importantly, while a part of the area surrounding the excluded property was improved with single-family dwellings, the area also included a substantial number of multifamily dwellings and a considerable number of multistory, high-intensity commercial uses. Indeed, in defendants' brief, defendants admit that there were "points of dissimilarity between [defendants'] comparable [sale] and the subject property [in] location and character of surrounding uses." Although defendants emphasize the points of similarity, in view of the noted dissimilarities, we cannot say that there was a clear abuse of the trial court's discretion in excluding evidence of such a sale.

We conclude that there was no error in either the admission of the District's comparable sale or in the exclusion of defendants' comparable sale.

Defendants next contend that the trial court improperly admitted into evidence a contract for the purchase of a portion of the subject property by one of defendants.

The District filed the petition to condemn on December 11, 1972. In 1962, Mr. Ted Shaf, one of defendants, had purchased approximately 17% of the subject property from Mr. John Lacci. On February 18, 1971, Shaf contracted to purchase the remaining 83% of the subject property from Lacci. That contract covered all of the presently involved commercially zoned property, and 80% of the residentially zoned property. The contract provided for a total purchase price of $670,000 to be paid in four installments. The contract also specified which portion of the purchased property would be transferred to Shaf as the installment payments were made. These "take-out" provisions provided that the commercially zoned property would be the last portion transferred to Shaf. In a pretrial ruling, the trial court admitted the 1971 contract to purchase 83% of the subject property for $670,000. Defendants contend that ruling was error.

■■ It is well settled that when land is taken by eminent domain, the price the owner paid for the land, or a portion of it, is admissible as evidence of its present value if it affords a fair indication of the property's value at the time the petition to condemn was filed. *(Department of Public Works & Buildings v. Klehm,* 56 Ill. 2d 121, 306 N.E.2d 1; *Forest Preserve District v. Krol,* 12 Ill. 2d 139, 145 N.E.2d 599; *Department of Public Works & Buildings v. Gieseking,* 108 Ill. App. 2d 105, 246 N.E.2d 707.) Indeed, one commentator has called such evidence "one of the most important pieces of evidence in determining its present value." (5 Nichols

on Eminent Domain §21.2 (3d ed. 1975).) Defendants conceded the general rule but argue that circumstances and conditions had so changed subsequent to execution of the contract that it was no longer fairly indicative of the property's value as of the date of filing the petition to condemn.

In this regard, defendants first argument is premised on the concept of plottage. "Plottage" has been defined as the enhanced value added to the aggregate value of two or more contiguous lots held in one ownership when the lands are vacant or covered by a single building. The rational is that two or more contiguous lots will normally have a greater value than the aggregate of the separate values of the constituent lots because the larger area has a greater capacity for service or use. (4 Nichols on Eminent Domain §12.35 (3d ed. 1975).) Defendants argue that the plottage of the 83% of the property purchased in 1971 with the 17% already owned was a changed condition which so enhanced the value of the entire parcel that the 1971 purchase was not truly indicative of the fair market value.

Defendants direct our attention to no Illinois decision applying the concept of plottage. However, even assuming the validity of such a concept, we cannot say that plottage alone would constitute such a changed condition as to render the 1971 contract no longer fairly indicative of the value of the subject property. Rather, it would seem that such a concept would be exactly the type of factor specifically considered in such a sale. Indeed, in the instant case, Shaf and Lacci are depicted as being extremely knowledgeable real estate developers. Lacci had been in the real estate business for over 50 years and had been a "forerunner" in the Morton Grove market, while Shaf had been in the business for over 25 years, and, specifically, in Morton Grove for over 16 years. Since Lacci was the one who had sold Shaf his first 17% of the property in 1962, he was obviously aware of Shaf's capability to merge title to the entire parcel. Such a factor would no doubt have been a major consideration in the bargain struck by two such knowledgeable parties. It is clear that in the instant case, plottage would not be a "changed condition," but instead, would have been at the heart of the 1971 contract.

In any event, for whatever plottage was worth as a changed condition, it was vigorously presented by defendants to the jury. Each one of defendants' witnesses testified that such a concept enhanced the value of the property and was a legitimate factor in determining the fair market value of the property. Since the jury was thoroughly apprised of such a concept, we cannot say that they were misled by it. (See *Department of Public Works & Buildings v. Gieseking.*) Indeed, defendants' brief states that plottage will generally be held to increase a property's total

value 10%. The jury's award in the instant case reflects a more than 10% increase based on the 1971 contract.

Defendants also argue that the highest and best use to which the property was reasonably adapted was markedly enhanced between the execution of the 1971 contract and the time the petition was filed. Defendants argue that in 1971, most of the property was zoned R-2. However, relying on the stipulation that there is a reasonable probability of rezoning, defendants argue that by 1972, the property should be considered as though rezoned for multiple-family use. Defendants contend this change from residential zoning to multiple family zoning constituted a sufficient alteration of circumstances to render the 1971 contract misleading with respect to the present value of the property.

However, defendants again misinterpret the effect of the stipulation that there was a reasonable probability of rezoning. That stipulation did not legally change the zoning of the instant property. It merely acknowledged the reasonable probability of some type of rezoning. And that was as probable in 1971 as it was in 1972. In fact, defendants admit that Shaf purchased the property in 1971 with the intention of rezoning the residential area to a higher use. Thus, it is clear that the 1971 contract was executed with the same considerations in mind as those that would be present in 1972. The stipulation in no way altered this factual similarity between 1971 and 1972. Moreover, it could not. For as noted earlier, even after the reasonable probability of some type of rezoning has been legally established, the jury cannot evaluate the property as though rezoned, but only as though there was a reasonable probability of rezoning. We conclude that there had been neither a factual nor a legal change in circumstances since 1971 based on rezoning.

Defendants also contend the 1971 contract was not fairly indicative of the current fair market value of the entire parcel because certain provisions of the contract indicate that most of the purchase price was allocated to purchase the commercially zoned property. Defendants rely on the "take-out" provisions of the contract reserving transfer of the commercial property until the residential property had been fully paid for, and other provisions indicating a much higher price per commercial lot than residential lot.

We fail to understand how these provisions in any way reduce the probative value of the 1971 contract. The jury was called upon to evaluate the entire parcel of land, not just the residentially zoned property, and the 1971 contract was for the purchase of the 83% of that land. Whatever the specific provisions for payment, the fact remains that two extremely knowledgeable parties agreed to a total purchase price of $670,000 for 83% of the subject property. Such evidence is obviously highly probative of

the fair cash market value of the property. We can discern no reason why such a contract should have been excluded merely because of the payment schedule the parties chose to rely on.

We conclude that the 1971 contract for the purchase of 83% of the subject property was properly admitted into evidence.

Defendants' final challenge to the propriety of the jury's award is based on the allegedly prejudicial closing argument of counsel for the District.

■■ It is unnecessary to set out the challenged statements made by counsel for, if any error occurred in closing argument, it was waived by defendants' counsel's failure to raise any objection to the argument. Not once during the argument, nor afterwards, did counsel utter a single objection to any comment made by the District's counsel. It is settled beyond dispute that counsel cannot take a chance of failing to make objections and then, upon receiving what he considers to be an adverse jury award, claim error. *(County of Cook v. Colonial Oil Corp.,* 15 Ill. 2d 67, 153 N.E.2d 844; *Forest Preserve District v. Dearlove,* 337 Ill. 555, 169 N.E. 753.) Moreover, we have reviewed the complained-of comments and, although some of counsel's statements are open to criticism, we believe that an objective reading of the entire record shows that these matters were not so prejudicial as to deprive defendants of a fair trial. *Board of Junior College District No. 515 v. Wagner,* 3 Ill. App. 3d 1006, 279 N.E.2d 754.

■■ ■ One final comment is appropriate concerning all the issues raised by defendants. The instant record presents a trial in which both sides vigorously presented their respective theories of valuation to the jury. The jury had the benefit of substantial expert testimony from both sides and the added opportunity to view the subject property. Both sides were represented by counsel with well-deserved reputations for excellence who ably argued their theories to the jury. In such cases the improper admission or the improper exclusion of value evidence has been held not to constitute reversible error. *(Trustees of Schools v. La Salle National Bank,* 21 Ill. 2d 552, 173 N.E.2d 464.) It has been often said that the damages awarded by the jury in a condemnation proceeding will not be disturbed unless there has been a clear and palpable mistake or some erroneous ruling which might have misled the jury, or the verdict was the result of passion and prejudice. *(Forest Preserve District v. Draper,* 387 Ill. 149, 56 N.E.2d 410.) The instant case presents no such palpable mistake nor any evidence of passion and prejudice.

The jury's award setting $1,000,000 as just compensation for the property taken is affirmed.

Defendants also raise four issues regarding the trial court's order granting the District immediate use and possession of the subject property pending appeal. Defendants first argue that the hearing which

resulted in the granting of that order violated their right to procedural due process.

Section 13 of the Eminent Domain Act (Ill. Rev. Stat. 1971, ch. 47, par. 13), allows the trial court to grant condemning bodies the use and possession of condemned property pending appeal upon deposit of a bond to pay "such compensation as may be finally adjudged in the case * * *." In the instant case, on April 25, 1974, the District notified defendants that in four days it would petition the trial court for an order granting the District immediate use and possession of the subject property upon deposit with the county treasurer of the full amount of the jury's award. The petition asked that the bond required by section 13 be waived and that the deposit of the award itself be deemed sufficient. Four days later, a hearing on that motion was held. After hearing arguments by both the District and defendants, the court denied the waiving of the bond but granted the District immediate use and possession of the subject property upon deposit of the full amount of the jury's award and a $200,000 surety bond.

Defendants construe the District's motion as having only requested a waiver of the bond requirement of section 13. Defendants contend that the court was thus without power to set a bond. Moreover, defendants argue that they were not notified that a bond would be set at that hearing, and conclude that, in doing so, the court denied them procedural due process.

The short answer to defendants' contention is that the gist of the District's motion was not to waive the requirement of a bond, but rather to acquire immediate use and possession of the subject property. Moreover, a reading of the hearing conducted indicates that defendants were fully cognizant of the issues raised by the motion. During the hearing, defendants' counsel did not question the purpose of the motion, nor did counsel request additional time in which to respond to the motion. On the contrary, counsel argued that the District should be required to post some sort of open-ended bond contingent on any new award that might occur on a remand of their appeal. During the hearing, counsel for defendants admitted that he had researched and was familiar with the decisions interpreting section 13.

■■ The essential elements of due process of law require that a party be given notice, and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case. (*City of Chicago v. Shell Oil Co.*, 29 Ill. 2d 136, 193 N.E.2d 759; *City of Chicago v. Cohn*, 326 Ill. 372, 158 N.E. 118.) In the instant case, defendants were given four days notice that the District's petition would be argued. At the hearing itself, defendants' counsel was given unrestricted opportunity for argument on the setting of the bond. Indeed, his views on the appropriate

amount were repeatedly solicited by the trial judge. Finally, the hearing itself was conducted in a manner more than adequate considering the nature of the relief sought. We conclude that the instant proceeding fully complied with the requirements of due process of law.

■■ Defendants next contend that the bond requirement of section 13 is inadequate to protect defendants' right to just compensation. In doing so, defendants level a broad constitutional attack on section 13. It is unnecessary to set out in any detail the specifics of defendants' argument because defendants failed to raise any such argument below, and consequently cannot do so for the first time on appeal. (Pickus v. Board of Education, 9 Ill. 2d 599, 138 N.E.2d 532; Jarvis v. Herrin City Park District, 6 Ill. App. 3d 516, 285 N.E.2d 564.) Moreover, we note that the constitutionality of section 13 of the Act has been specifically upheld. Department of Public Works & Buildings v. Butler Co., 13 Ill. 2d 537, 546, 150 N.E.2d 124; Village of Prairie Du Rocher v. Schoening-Koenigsmark Milling Co., 251 Ill. 341, 96 N.E. 249.

Defendants next contend that the trial court's order granting the District use and possession of the property pending appeal exceeded the scope of possession permitted under section 13 of the Act. Defendants contend that the court's order authorized the District "to take unlimited possession of the subject property without limitation and with privilege to exercise all exclusive rights of ownership." Defendants conclude that section 13 only empowers the District to enter upon the property for purposes "preliminary" to that of its intended use.

We need not decide exactly what scope of possession section 13 permits. For there is nothing in the record to support defendants' assertion that the District was granted unlimited possession to exercise all exclusive rights of ownership. Rather, the order entered by the trial court specifically provided that the District "be authorized and empowered to enter upon, take immediate possession of and use the real property * * * pursuant to section 13" of the Act. Thus it is clear that the District was granted use and possession of the real estate only to the extent permitted by section 13. Consequently, the scope of possession granted could not have exceeded that permitted by the Act.[2] Defendants' argument is thus not factually supported by the record.

■■ Defendants finally argue that the bond actually set by the trial court was not in compliance with the terms of the Act. Section 13 requires the "entering into bond, with sufficient surety, payable to the party interested in such compensation, conditioned for the payment of such compensation as may be finally adjudged in the case * * *." In the instant case, the trial court required the District to deposit the full amount of the

---

[2] The question of whether the actual use exercised by the District exceeded that granted by the trial court's order is not presented by the instant record nor advanced by defendants.

jury's award and, in addition, a surety bond of $200,000. The trial judge stated that such deposits should be more than adequate to cover any potential recovery. In the trial court's opinion, the total sum deposited was within the potential recovery based upon the testimony. As is obvious, it is impossible to exactly determine what another jury may award based upon the same evidence. It must thus be left to the trial court's sound discretion to determine the total amount of bond required under section 13. Based upon the evidence presented and in view of defendants' concession that a $1,000,000 award was supported by the evidence, we cannot say that the trial court abused its discretion in requiring a total deposit of $1,200,000. We conclude that the instant deposit fully complied with the terms of section 13.

For all the reasons set out above, the judgment and order appealed from are affirmed.

Judgment and order affirmed

HAYES and SIMON, JJ., concur.